ADVANCED TELEPHONE SYSTEMS, INC., t/d/b/a ATS Mobile Communications, Appellant

v.

COM–NET PROFESSIONAL MOBILE RADIO, LLC; W.E. Anderson Group Inc.; Com–Net Critical Communications, Inc.; Steven Savor, Jr.; Stephen Frobouck; and William E. Anderson, Appellees.

Superior Court of Pennsylvania.

Argued Aug. 27, 2003.

Filed April 6, 2004.

---

Joseph Decker, Pittsburgh, for appellant.

William M. Wycoff, Pittsburgh, for appellees.

Before: JOHNSON, HUDOCK and ORIE MELVIN, JJ.

HUDOCK, J.

¶ 1 Advanced Telephone Systems, Inc., t/d/b/a ATS Mobile Communications (ATS), appeals from the judgment entered against it by the trial court and in favor of all Appellees, save Com–Net Professional Mobile Radio, LLC (the LLC). Among the issues raised by ATS on appeal is whether there is a constitutional right to jury trial on the question of whether the "corporate veil" of a limited liability company should be pierced in this action for breach of contract. We determine that there is not such a right. Moreover, because we find no merit to the other claims raised by ATS, we affirm the judgment entered in favor of Appellees.

¶ 2 The procedural history of this case may be summarized as follows: In its second amended complaint, ATS raised a single breach of contract claim against the LLC, as well as "alter ego" allegations against W.E. Anderson Group, Inc. (the Anderson Group), Com–Net Critical Communications, Inc. (CCCI) [1] and three individuals, Steven Savor, Jr. (Savor), Stephen Frobouck (Frobouck), and William E. Anderson (Anderson). Prior to trial, Appellees filed a "Motion for Resolution of Alter Ego Claims by the Court Sitting in Equity." The trial court reserved decision on the motion, and a jury trial commenced on April 2, 2002. On April 3, 2002, the trial court granted Appellees' motion. At the conclusion of the evidence, the court

---

1. At the time of the events leading to the contract between ATS and the LLC, CCCI was named Com–Net Professional Mobile Radio, Inc. For ease of reading, the predecessor corporation will be referred to as CCCI.

directed a verdict on the issue of liability for breach of contract against the LLC. Thus, the issue of damages was submitted to the jury. The jury returned a verdict in favor of ATS and against the LLC in the amount of 2.5 million dollars plus attorney fees. This determination is not at issue on appeal.

¶ 3 Following the jury verdict, the trial court considered ATS's corporate piercing claim. ATS sought to pierce the LLC's corporate veil by contending that that company was misused by Appellees such that the LLC became their alter ego, rendering them undeserving of limited liability protection. ATS further attempted to prove that the LLC was never adequately capitalized and that the individual Appellees, especially Savor and Frobouck, induced ATS to enter the contract with the LLC by representing that it was backed by the financial strength of the Anderson Group. Following extensive oral argument and the submission of proposed findings of fact and conclusions of law, the trial court concluded that the corporate veil could not be pierced. Thus, in its decree nisi dated May 15, 2002, the court found that it could not impose liability for the LLC's breach upon any of Appellees.[2] ATS then filed post-trial motions, which were denied, and a final decree was filed. Judgment subsequently was entered, making the case ripe for appellate review.[3]

¶ 4 On appeal, ATS seeks to avoid the judgment entered against it and in favor of Appellees by raising the following issues on appeal:

I. WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW WHEN IT REJECTED PRECEDENT AND HELD THAT THE JURY COULD NOT DECIDE THE ISSUE OF PIERCING THE CORPORATE VEIL, AND THAT THE PIERCING ISSUE HAD TO BE DECIDED BY THE COURT.

II. WHETHER ATS WAS ENTITLED TO A JUDGMENT [NOTWITHSTANDING] THE VERDICT BECAUSE THE COURT FOUND THAT [THE LLC] HAD NO ASSETS, THAT [APPELLEES] CO–MINGLED THEIR ACCOUNTS AND PAID ALL OF [THE LLC'S] DEBTS AND EXPENSES, THAT [APPELLEES] DID NOT FOLLOW .FORMALITIES AND THAT [SAVOR] SIGNED THE AGREEMENT WITH ATS AS "LEVERAGE" TO COMPEL [EQUITABLE RESOURCES, INC. (ERI) ] TO COMPLETE THE ERI-[LLC] TRANSACTION.

2. On December 17, 2003, the Supreme Court promulgated amendments to the Rules of Civil Procedure to be effective July 1, 2004. These amendments abolish the separate equity action and merge claims for equitable relief into the civil action. Significant changes have been made regarding trial of claims for equitable relief. Rules 1516, 1517 and 1520, concerning adjudication and decree nisi, have been rescinded, and trial in claims for equitable relief is to be governed by Rule 1038. In addition, Rule 1038.3, providing for a jury trial, with the court's permission, on claims for equitable relief, had been added in place of Rule 1513. The Note to Rule 1038.3 states

that this rule does not confer a right to a jury trial of equity claims if that right did not exist prior to consolidation of equity and civil actions. As a result of these changes, a trial judge will have to exercise "good judgment" in determining how to proceed in actions that raise both civil claims and claims for equitable relief. Explanatory Comment, I.(d.).

3. ATS complied with the trial court's request, pursuant to Pa.R.A.P.1925(b), for a concise statement of matters complained of on appeal, and the trial court has filed a Rule 1925(a) opinion addressing ATS's claims.

III. WHETHER ATS SHOULD HAVE BEEN GRANTED A NEW TRIAL WHERE THE COURT BASED ITS HOLDING THAT IT COULD NOT PIERCE THE VEIL OF [THE LLC] ON THE FINDING THAT [THE LLC] WAS NOT MISUSED, WHERE THIS FINDING WAS BASED ON THE ERRONEOUS LEGAL PRINCIPLE THAT [THE LLC] DID NOT HAVE TO BE CAPITALIZED WHEN IT SIGNED THE CONTRACT AND WHERE THE COURT FOUND THAT ATS'S CONTRACT WAS NOT CONTINGENT.

IV. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED, ON TWO SEPARATE OCCASIONS AND OVER ATS'S OBJECTIONS, [SAVOR'S] UNFOUNDED TESTIMONY THAT ATS "KNEW" THAT [THE LLC] WOULD NOT MAKE PAYMENTS UNDER THE SERVICE AGREEMENT IF [THE LLC'S] SEPARATE DEAL WITH ERI DID NOT CLOSE, EVEN THOUGH THE COURT STATED IT DID NOT RELY ON THE TESTIMONY AND IT WAS NOT ADMITTED FOR ITS TRUTH.

ATS's Brief at 4.[4]

¶ 5 The trial court's factual findings may be summarized as follows: CCCI and Anderson Group were separate corporate entities and maintained their operations and corporate affairs separately from those of the LLC. They did not derive any profit from the LLC, as the LLC was never able to close the deal crucial to its purpose and therefore itself made no profit and had no assets other than the fourteen radio channels it was leasing from ATS. Savor, Frobouck and Anderson worked together in the same group of companies and other ventures, always through established corporate entities. They also had success elsewhere in the United States with businesses involving other communications systems and communication towers. On November 4, 1997, Anderson Group and Daniel Eldridge (not a party to this action) had formed Com–Net Development Group, LLC, to build, lease and sell communication towers for mobile radio and cellular communications.

¶ 6 In 1998, representatives of CCCI had approached Equitable Resources, Inc. (ERI), with a proposed alternative to ERI's existing internal communications system. Instead of ERI operating its own system and leasing the fourteen channels directly from ATS, on a month-to-month basis, the proposal envisioned an independent communications system, owned and maintained by an independent entity, of which ERI would be one customer. Because a necessary part of the proposed transaction with ERI would be the lease of the fourteen channels from ATS, negotiations were also conducted with ATS to secure the radio frequencies for the term of the proposed agreement with ERI.

¶ 7 On November 24, 1998, Savor, Frobouck and Richard Serdynski (Serdynski) met with Grier Adamson (Adamson), ATS's Treasurer and CEO, and Stephen

---

**4.** Appellate review of these issues has been rendered difficult because the argument portion of ATS's Brief does not address each issue distinctly, but rather blends a majority of these claims within its several arguments. *See* Pa.R.A.P. 2119(a) (explaining that the argument portion of an appellate brief "shall be divided into as many parts as there are questions to be argued"). In fact, as ATS provides no specific argument with regard to its fourth issue, we will not consider it further. As to ATS's remaining issues, we have chosen to address ATS's arguments as set forth *infra.*

Freund (Freund), ATS's General Manager, at Quicksilver Golf Club to discuss leasing ATS's radio frequencies. Savor, Frobouck and Serdynski gave ATS their business cards, which identified Com–Net Development Group, LLC, as the Com–Net entity they represented. Frobouck and Savor also gave Adamson and Freund business cards which identified them as executives in the "Anderson Group of Companies." Frobouck's business card identified him as President, and Savor's business card identified him as "Vice President of Corporate and Legal Affairs." Adjudication, 5/15/02, at 12; Findings of Fact at ¶ 37. Both Savor and Frobouck are attorneys.

¶ 8 Savor and Frobouck told ATS's Adamson and Freund at the meeting that they were negotiating with ERI for the sale and leaseback of ERI's two-way radio system assets to Com–Net Development Group, LLC. ERI was ATS's most important existing customer. ATS's channels were an integral and critical part of the ERI radio system, and ERI was paying ATS $2,000.00 per month per channel for twelve channels on an undocumented, month-to-month basis. Savor and Frobouck stated that ERI had told them to talk to ATS about leasing ATS's radio frequencies on a long term lease. Savor and Frobouck needed a long-term lease for ATS's channels to develop the proposed radio system in Western Pennsylvania, which was to include ERI as a principal user.

¶ 9 At the November 24, 1998, meeting, Savor and Frobouck told ATS that, in addition to contracting with ERI for the radio system, their business plan included putting other public and private entities, such as Allegheny County, Duquesne Light and People's Natural Gas, on their two-way radio system. Frobouck wanted to combine the thirty-seven specialized mobile radio entities in Western Pennsylvania that were operating such systems.

¶ 10 Adamson and Savor negotiated the contract directly. During the negotiations, ATS was represented by counsel, and Savor was a practicing attorney. ATS's counsel was a Washington, D.C. lawyer who specialized in communications law and who drafted the "800 MHz Subscriber Service Agreement" (Service Agreement) and implemented negotiated changes to it. Adjudication, 5/15/02, at 5; Findings of Fact at ¶¶ 1, 5. Initial drafts of the Service Agreement identify Com–Net Development Group, LLC, as the signatory of the Service Agreement. Two days before the Service Agreement was signed, Savor asked Adamson to substitute the LLC as the entity which would sign the contract with ATS. Adamson agreed to make this change and did so personally. Thus, before the Service Agreement was executed, Adamson directed ATS's counsel to change the signatory and the party to the Service Agreement from Com–Net Development Group, LLC, to the LLC.

¶ 11 The subject matter of the Service Agreement was the use of fourteen 800 MHz radio frequency channels for which ATS held licenses from the Federal Communications Commission (FCC). Pursuant to the Service Agreement, the LLC leased the fourteen channels from ATS for $2,000.00 per month and channel. The term of the Service Agreement was to be fifteen years.

¶ 12 Adamson knew that the early drafts of the Service Agreement were with Com–Net Development Group, LLC, and he knew that ATS would be entering into the Service Agreement with a limited liability company. Prior to the time the parties entered into the Service Agreement, Adamson knew what limited liability companies were.

¶ 13 Adamson contacted Savor shortly before March 24, 1999, and indicated that ATS was prepared to sign the Service

Agreement. Savor was willing to do this as he believed it gave the LLC leverage to persuade ERI to complete its deal with the LLC sooner. ATS did not ask any representative of the LLC for financial statements or *pro formas*. It did not do any due diligence nor did it seek any form of guaranties of the LLC's contractual obligation from any other entity or individual. Paragraph 10.1 of the Service Agreement contained an integration clause which provides:

> 10.1 This Agreement (including any schedules hereto), and all other documents delivered pursuant to this Agreement constitute the entire understanding between the Parties relating to the subject matter of this Agreement and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings, representations, warranties and communications of any kind of or between the Parties, whether oral or written, respecting such subject matter.

Adjudication, 5/15/02, at 7; Findings of Fact at ¶ 18.

¶ 14 As of March 24, 1999, ERI had told ATS that ERI's "agreement with [the LLC] was on track and they were proceeding and yes, [ERI] should be negotiating and working with [the LLC]." *Id.* at 7; Findings of Fact at ¶ 17. The LLC's obligation to perform under the Service Agreement, however, was not contingent upon the sale of the ERI radio system closing. There is no contingency clause in the Service Agreement that releases the LLC from its contract if the ERI transaction did not close.

¶ 15 Savor was the person "most knowledgeable" about the LLC's affairs. Savor and Adamson signed the Service Agreement between ATS and the LLC on March 24, 1999, even though the LLC never had any assets. *Id.* at 13; Findings of Fact at ¶ 41.

¶ 16 PNC Bank (PNC) was to provide the initial funding for the purchase of ERI's system with a bridge loan of $ 8.2 million. With a signed lease from ERI as collateral, the LLC planned to issue notes bearing interest at 7.52% to secure its borrowing of ten to fifteen million dollars from Provident Life and Accidental Insurance Company (Provident). PNC would have funded the bridge loan had ERI signed an agreement with the LLC. CCCI, as the member of the LLC, was to guarantee the repayment of PNC's bridge financing. Provident made a binding commitment to the LLC to buy collateralized notes in an amount between ten and fifteen million dollars, contingent on ERI agreeing to sell its system. CCCI provided a guaranty for Provident's commitment to the LLC.

¶ 17 A certificate of formation of the LLC was filed with the Delaware Secretary of State on December 28, 1998. The purpose of the LLC was to own, operate and maintain a communications system suitable for the use of utility customers, including ERI and other customers. The LLC was formed to hold all the assets involved in the proposed transaction between ERI and the LLC. The LLC would have had assets, and fifteen million of financing, once ERI signed the various agreements with the LLC; however, those agreements were never signed. David J. Fasulo, as counsel for CCCI, the member of the LLC, filed an application for a federal employer identification number for the LLC. Andrew Stidd (Stidd) of Global Securization, LLC, was retained as an independent manager for the LLC. Stidd's duty to the bondholders would have been to ensure that all payments received from the system users were properly used to pay the bondholders and other accounts

payable of the LLC so that there would be no default and so that the members or officers could not use any revenues for their own purposes. Until the deal with ERI closed, the LLC could not issue bonds or borrow significant amounts of money. Additionally, Stidd had no need to be involved with the LLC, including its signing of the Service Agreement with ATS, until the ERI deal was concluded. As discussed below, because the ERI deal never went through, Stidd never did anything for the LLC other than sign the Certificate of Formation.

¶ 18 The LLC adhered to the appropriate formalities for a limited liability company, "which are few." Adjudication, 5/15/02, at 10; Findings of Fact at ¶ 31. Given the nature of limited liability companies generally and its start-up status, the LLC shared office space, equipment and personnel with other Com–Net entities in the initial stages of its formation. The LLC never had any financial statements, statements of assets, or bank accounts, and it never filed any tax returns, because the LLC "never got that far." *Id.* at 14; Findings of Fact at ¶ 43. The LLC never had any employees. It never had office space separate from the Anderson Group. The LLC never reached the point where it needed to be capitalized. The crucial deal with ERI was never consummated, rendering the LLC's purpose impossible to achieve.

¶ 19 The draft operating agreement of the LLC provided that the LLC was to file for authorization to do business in Pennsylvania. That authorization was never requested because the ERI deal failed, and the LLC did no business in Pennsylvania. Agreeing to pay for the radio leases is not "doing business in Pennsylvania," nor is making a few early payments on account of a fifteen-year contractual obligation. Adjudication, 5/15/02, at 16; Findings of Fact at ¶ 54. As of December 10, 1998, the Secretary of State of the Commonwealth of Pennsylvania certified that CCCI was a corporation in good standing.

¶ 20 Savor knew that the LLC could not and would not pay ATS under the Service Agreement unless ERI signed the agreements with the LLC and Provident loaned money to the LLC. Savor "did not have to tell this elementary fact of LLC life to Adamson or Freund because, as sophisticated businessmen, they already knew this." Adjudication, 5/15/02, at 14; Findings of Fact at ¶ 47. The failure of ATS to get guarantors for the contract at issue was not induced in any way by any or all of Appellees.

¶ 21 As of March 24, 1999, Savor, Frobouck, Adamson and Freund all knew that no third parties such as Duquesne Light or Allegheny County had yet made any firm commitments to use the proposed radio system.

¶ 22 The LLC itself never made any payments under the Service Agreement. The six payments made to ATS under the Service Agreement were made through the Anderson Group. The checks were drawn on Anderson Group's checking account, including the check given to ATS at the signing of the Service Agreement on March 24, 1999, in Anderson Group's offices at 2501 CNG Tower in Pittsburgh. The LLC never repaid Anderson or Anderson Group any of the money which Anderson Group had paid to cover the LLC's initial expenses. The amounts of payment to ATS from the Anderson Group were informal advances or "good Samaritan" loans to the LLC, the repayment of which was reasonably expected by all parties, including ATS, to be done at the closing of the ERI deal.

¶ 23 ATS was aware of the larger deal that was being negotiated with ERI. At the time he signed the Service Agreement on March 24, 1999, Adamson was aware

that the LLC had not yet entered a contract with ERI and that negotiations with ERI were ongoing. Al Beatty (Beatty) was the director of ERI's Communications Department from the time that CCCI made its proposal to ERI, until December 31, 1998. ERI experienced a change in upper management in January 1999. ERI did not intend to continue its arrangement with ATS and instead planned to outsource its communications department sometime in 1999. One of the possible outsources ERI was considering was the LLC.

¶ 24 Beatty remained at ERI as a consultant and had personal knowledge of the progress of the proposed deal with ERI until April 16, 1999. Beatty testified that, up to the time of his departure on that date, ERI's new management had not yet made a decision to halt or terminate the deal with the LLC, and the deal was ongoing and under consideration when he left.

¶ 25 As of March 24, 1999, the date on which ATS signed the Service Agreement, negotiations between ERI and the LLC were still ongoing. After the signing of the Service Agreement, and while negotiations between the LLC and ERI were proceeding, ERI leased the fourteen channels from the LLC on a month-to-month basis.

¶ 26 By early August 1999, the new ERI management had opted to use another communications system and the proposed sale and leaseback of its systems to the LLC "was finally dead." Adjudication, 5/15/02, at 17; Findings of Fact, at ¶ 64. When no commitments from Duquesne Light or Allegheny County were forthcoming, the LLC, in October 1999, informed ATS that it would be making no further payments under the Service Agreement. The LLC returned the channels to ATS, which eventually sold them to Nextel, thereby mitigating the contract damages.

¶ 27 The trial court refused to accept ATS's proposed findings of fact that the LLC form was misused in any way by either the Anderson Group or CCCI. Upon review, we find that the above factual findings are supported by the record.

¶ 28 Based upon the above factual findings, the trial court concluded that ATS knew it was dealing with the LLC, a limited liability company, and admitted that it knew the LLC would have assets only if the ERI deal was consummated. According to the trial court, "neither the [Service Agreement] nor any of the other evidence supports the position of ATS that the corporate entities, or any of them, were misused or necessary formalities ignored." Adjudication, 5/15/02, at 22.

¶ 29 As stated above, ATS's first claim concerns whether the trial court properly took the question of piercing the corporate veil from jury determination. The trial court found that there was no definitive answer as to whether the issue of corporate piercing should be determined by the trial judge or a jury and cited to *Hanrahan v. Audubon Builders, Inc.*, 418 Pa.Super. 497, 614 A.2d 748 (1992), in concluding that "given the equitable nature of piercing the corporate veil, it was proper for this issue to be decided by the Court, rather than by a jury." Trial Court Opinion, 1/15/03, at 13.

¶ 30 In support of its claim that the trial court erred in making this determination, ATS makes several arguments: 1) Pennsylvania law determines whether this issue should go to the jury; 2) ATS had a constitutional right to a jury trial and, in numerous cases involving the corporate piercing claim, as well as other claims for equitable relief, a jury has decided the issue; and 3) taking the piercing issue from the jury was not, as the trial court concluded, harmless error, "because the court stated that it based its holding on credibility determinations and there was overwhelming evidence to support a finding that the veil of

[the LLC] should be pierced." ATS's Brief at 23 (emphasis deleted). We will address each claim separately.

¶ 31 As already noted, the LLC's certificate was filed in Delaware. Thus, the issue that arises is whether Pennsylvania or Delaware law is to be used when determining whether ATS had the constitutional right to have a jury decide the piercing claim. Appellees claim that Delaware law, which provides for the corporate piercing decision to be made by the court of chancery, should be followed. ATS asserts that Pennsylvania law should apply because the issue is one of procedure rather than substantive law, and the contract at issue provided that disputes would be determined according to Pennsylvania law. *See* Service Agreement, 3/24/99, at ¶ 10.3. After review, we agree with ATS. *See Singer v. Messina,* 312 Pa. 129, 167 A. 583 (1933) (holding that the law of the forum determines whether an issue of fact shall be determined by the court or the jury); *Dauphin Deposit Bank and Trust Co. v. Pifer,* 383 Pa.Super. 275, 556 A.2d 904, 906 (1989) (reiterating that "the right to trial by jury is not a 'substantive right,' but a right of procedure through which rights conferred by substantive law are enforced"). Thus, we shall consider whether the Pennsylvania Constitution affords ATS the right to trial by jury in its attempt to pierce the corporate veil of several of the Appellee entities.

¶ 32 As our Supreme Court has recently summarized:

The applicable constitutional provision provides, in relevant part, that "trial by jury shall be as heretofore, and the right thereof remain inviolate." Pa. Const. art. 1, § 6. In construing this section, this Court has consistently held that the right to a jury trial as preserved by our Constitution extends to all causes of action that existed at the time the Constitution was adopted. *See [Wertz v.*

*Chapman Township,* 559 Pa. 630, 635–38, 741 A.2d 1272, 1275–76 (1999)]; *Commonwealth v. One (1) 1984 Z–28 Camaro Coupe,* 530 Pa. 523, 610 A.2d 36, 41 (1992) (right to jury trial for *in rem* forfeiture cases preserved by Pennsylvania Constitution where such cases heard by juries at time of adoption of Constitution); *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59, 64–65 (1961) (right to jury trial for obscenity charge preserved by Pennsylvania Constitution where such cases heard by juries at time of adoption of Constitution); *Appeal of Watson,* 377 Pa. 495, 105 A.2d 576, 577–78 (1954) (no right to jury trial on issue of tenure for teacher fired for "mental derangement" where such cases not heard by juries at time of adoption of Constitution); *Premier Cereal & Beverage Co. v. Pennsylvania Alcohol Permit Bd.,* 292 Pa. 127, 140 A. 858, 859–60 (1928) (no right to jury trial on issue of revocation of liquor license where such cases not heard by juries at time of adoption of Constitution). As this Court explained in 1866:

The great purpose of the constitution in providing that "trial by jury shall be as heretofore, and the right [ ] thereof remain inviolate," was not to contract the power to furnish modes of civil procedure in courts of justice, but to secure the right of trial by jury in its accustomed form before rights of person or property shall be finally decided. Hence the right of trial as it then existed was secured, and the trial itself protected from innovations which might destroy its utility and its security as a palladium of the liberties of the citizen. But beyond this point there is no limitation upon legislative power in constructing modes of redress for civil wrongs, and regulating their provisions.

*Haines v. Levin,* 51 Pa. 412, 414 [ (1866) ].

*Mishoe v. Erie Insurance Co.,* 573 Pa. 267, 279–80, 824 A.2d 1153, 1160 (2003) (footnote omitted).⁵

■ ¶ 33 ATS asserts that it had a constitutional right to a jury trial on the issue of piercing the corporate veil of the several Appellee entities because an action for piercing the corporate veil existed at the time the Pennsylvania Constitution was adopted in 1790 and an action to impose liability on individual shareholders was brought as an action at common law. To support this claim, ATS relies upon *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131 (2d Cir. 1991). We find that ATS's reliance upon *Passalacqua* to be misplaced.

■ ¶ 34 In *Passalacqua,* the plaintiff builder had obtained a $1.7 million dollar judgment against Resnick, a hotel developer, for breach of a building contract. Passalacqua was unable to recover the full amount of the judgment and brought an action to pierce the corporate veil of Resnick. The federal district court denied Resnick's motion to strike Passalacqua's jury demand. The only issue for trial was the alter-ego liability of individuals in the Resnick family and of corporate entities controlled entirely by them. The Second Circuit affirmed the district court's decision to try the case to a jury. In reaching

this result, however, the circuit court addressed the right to a jury under the Seventh Amendment of the United States Constitution rather than the Pennsylvania Constitution at issue in this case. Moreover, the *Passalacqua* court acknowledged that both the United States Supreme Court and the Court of Appeals for the Third Circuit have found that corporate piercing is an equitable issue for which no right to a jury trial exists. *Passalacqua,* 933 F.2d at 135 (citing *Bangor Punta Operations, Inc. v. Bangor Aroostook R.R. Co.,* 417 U.S. 703, 713, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), and *United States v. Golden Acres, Inc.,* 684 F.Supp. 96, 103 (D.Del.1988), *aff'd sub nom., Golden Acres, Inc. v. Sutton Place Corp.,* 879 F.2d 857 (3d Cir.1989)).⁶ Finally, and perhaps most significantly, our Pennsylvania Supreme Court has concluded that the Pennsylvania analysis of whether there is a right to a jury trial differs from the federal analysis. *Wertz v. Chapman Twp.,* 559 Pa. 630, 641–42, 741 A.2d 1272, 1278 (1999). In *Commonwealth v. One (1) 1984 Z-28 Camaro Coupe,* 530 Pa. 523, 610 A.2d 36 (1992), our Supreme Court set forth the following three-prong test: Initially, the court is to determine whether there is a statutory basis for a jury trial. If no statutory basis exists, the next inquiry is whether the particular cause of action existed at the time the Pennsylvania Constitution was adopted. Finally, if the cause of action

5. In *Mishoe,* the high court also noted that Article 1, section 6 has remained essentially unchanged since the adoption of our state's Constitution of 1790. "The Constitution of 1776 generally provided that, in civil suits, 'the parties have a right to trial by jury, which ought to be held sacred,' Pa. Const. (1776) ch. 1, cl. 11, and that 'trials shall be by jury as heretofore,' id. ch. 2, § 25. The Constitution of 1790 provided 'that trial by jury shall be as heretofore, and the right thereof remain inviolate.' Pa. Const. (1790) art. 9, § 6. The wording of this provision has not changed since 1790, although in 1874 it was moved to a

different section within the Constitution. *See* Pa. Const. (1838) art. 9, § 6; Pa. Const. (1874) art. 1, § 6; Pa. Const. (1968) art. 1, § 6." *Mishoe,* 573 Pa. at 280, n. 10, 824 A.2d 1153, 1160 n. 10.

6. According to the U.S. Supreme Court, in cases involving the issue of disregarding a corporate form, "courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form." *Bangor Punta,* 417 U.S. at 713, 94 S.Ct. 2578.

and a right to jury existed at that time, then the inquiry is whether a common law basis existed for the claim. *Wertz*, 559 Pa. at 641, 741 A.2d at 1276 (citing *Camaro Coupe*, 530 Pa. at 527–29, 610 A.2d at 39).

 ¶ 35 In *Wertz, supra*, the high court noted that the primary inquiry is whether the cause of action existed at common law at the time the Pennsylvania Constitution was adopted. In contrast, "federal case law examines whether the statutory cause of action is analogous to a common law claim for which there was a right to trial by jury, with focus … on the relief provided." *Wertz*, 559 Pa. at 641, 741 A.2d at 1278 (citations omitted). In *Wertz*, our Supreme Court held that a right to a jury trial in an action under the Pennsylvania Human Relations Act did not exist because the specific cause of action did not exist when the Pennsylvania Constitution was enacted in 1790. In so concluding, the high court stated, "we find the federal decisions predicting a finding of the right to a jury trial to be unpersuasive and decline [Wertz's] suggestion that we adopt an analysis similar to that utilized by our federal colleagues." *Wertz*, 559 Pa. at 642, 741 A.2d at 1278. Additionally, the court noted that Wertz's "analogy" argument was "contrary to this court's prior case law, and thus, without merit." *Id.*

¶ 36 The Circuit Court in *Passalacqua* analogized an alter-ego action to a creditor's bill procedure that existed at common law in order to conclude that there exists a right to jury trial for an alter-ego/corporate piercing claim. Clearly, our Supreme Court, in light of *Wertz, supra*, would find such an analogy unpersuasive and look to whether such a cause of action actually existed at the time the Pennsylvania Con-

stitution was adopted and at common law. The parties do not dispute the fact that there is no statutory basis upon which to pierce the corporate veil. Moreover, as ATS has failed to identify any specific cause of action for corporate disregard which predated the Pennsylvania Constitution or existed at common law, we find ATS's claim to a constitutional right to a jury trial on its corporate piercing claim to be without merit.

 ¶ 37 Given this conclusion, the question becomes whether the trial court abused its discretion in deciding the corporate piercing claim rather than submitting it for jury determination. ATS argues that the trial court erred in doing so because Pennsylvania precedent establishes that juries "routinely" have decided corporate piercing claims, as well as other equitable doctrines, and the court's error is not harmless because questions of credibility are traditionally for the jury and there was "overwhelming evidence to support a finding that the veil of [the LLC] should be pierced." ATS's Brief at 20, 23.

¶ 38 We are unpersuaded by ATS's arguments. Initially, we note that, although it correctly cites Pennsylvania state cases where the corporate piercing issue had been submitted to the jury or the jury had considered other equitable claims of relief, none of these cases squarely address the right to jury consideration.[7] In addition, we note that ATS has not adequately explained why a trial court could not properly make the necessary credibility determinations vis-à-vis the corporate piercing claim. *See Wertz*, 559 Pa. at 642–43, 741 A.2d at 1279 (explaining that, "While we are aware of the great value placed on a

---

7. To counter this argument, Appellees cite to Pennsylvania cases that have "consistently held" that the corporate piercing issue is a form of equitable relief for which "[a] court of equity is peculiarly adapted[.]" *See* Appel-

lees' Brief at 15–16 (citing cases). In its reply brief, ATS argues that none of these cases have addressed squarely the issue of whether a court, rather than a jury, should consider the claim.

trial by a jury of one's peers in our Commonwealth, we are confident that the judges of our Commonwealth are equally capable as jurors to justly resolve claims of discrimination brought under the [Pennsylvania Human Relations Act"]; *Mishoe,* 573 Pa. at 278, 824 A.2d at 1159 (concluding that a plaintiff does not have a right to a jury trial in an insurance bad faith claim and rejecting the plaintiff's emphasis of the "importance of jury trials without explaining how trial judges are incapable of serving the public interest in redressing bad faith").

¶ 39 ATS cites to *Cantiere DiPortovenere Piesse S.p.A. v. Kerwin,* 739 F.Supp. 231 (E.D.Pa.1990), for the proposition that "the issue of corporate disregard is generally submitted to the jury." *Cantiere,* 739 F.Supp. at 236. Initially, we note that we are not bound by this decision. *See Werner v. Plater–Zyberk,* 799 A.2d 776, 782 (Pa.Super.2002) (discussing consideration of federal cases that address issue before state appellate court). Moreover, in support of its holding, the *Cantiere* court, while recognizing that the Third Circuit Court of Appeals "has never explicitly addressed the issue of whether a jury may properly hear the issue of disregard of the corporate entity," referred to decisions from other circuit courts and states and noted that " 'under the law of Delaware, a state which staunchly maintains the division of law and equity,' piercing the corporate veil should not be decided by the jury." *Cantiere,* 739 F.Supp. at 236 (citing *United States v. Golden Acres, Inc.,* 684 F.Supp. 96, 103 (D.Del.1988)).

¶ 40 Although the *Cantiere* court also cited to a prior decision of the United States District Court for the Eastern District of Pennsylvania, *Commodore Business Machines, Inc. v. Blackley, Townsend, Winborg and Zurn, Inc.,* 1985 WL 4476, 1985 U.S. Lexis 12931 (1985), to support its claim that corporate piercing

claims are properly for jury determination, that case did not involve the question of who decides a corporate veil-piercing issue. Rather, *Commodore* involved a motion to dismiss for lack of personal jurisdiction. Although acknowledging the pertinent law in Pennsylvania regarding a corporate piercing claim, *Sams v. Redevelopment Authority,* 431 Pa. 240, 244, 244 A.2d 779, 781 (1968), and *Ashley v. Ashley,* 482 Pa. 228, 237, 393 A.2d 637, 641 (1978), both of which involved a non-jury determination regarding the corporate piercing issue, the *Commodore* court denied the motion to dismiss, in part, because "a reasonable jury" could find that the doctrine of corporate piercing was satisfied and determine that the corporate nature of the parent and subsidiary should be disregarded. We decline to follow this federal case.

¶ 41 Finally, we are not persuaded by ATS's reference to 12 *Summary of Pennsylvania Jurisprudence* (2d) Business Relationships § 1:27 (2001) for the proposition that "[i]t is proper to submit the question of corporate disregard to the jury" since the hornbook cites to *Cantiere* for this proposition. For all of the above reasons, we conclude that the trial court did not abuse its discretion in granting Appellees' motion to have the court resolve the corporate piercing claim.

¶ 42 Thus, we next consider whether the trial court properly found that ATS was not entitled to pierce the corporate veil of the LLC. As our Supreme Court has summarized:

[T]here is a strong presumption in Pennsylvania against piercing the corporate veil. *Wedner v. Unemployment Board,* 449 Pa. 460, 464, 296 A.2d 792, 794 (1972) ("[A]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.... Care should be

taken on all occasions to avoid making the entire theory of corporate entity * * * useless. *Zubik v. Zubik,* 384 F.2d 267, 273 (3d Cir.1967)"). Also the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person. *College Watercolor Group, Inc. v. William H. Newbauer, Inc.,* 468 Pa. 103, 117, 360 A.2d 200, 207 (1976).

Commonwealth Court has set out the factors to be considered in disregarding the corporate form as follows:

> undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetuate a fraud. *Department of Environmental Resources v. Peggs Run Coal Co[.],* [423 A.2d 765 (Pa.Cmwlth.1980) ].
>
> *Kaites v. Dept. of Environmental Resources,* [529 A.2d 1148, 1151 (Pa. Cmwlth.1987) ]. *See also Watercolor Group v. Newbauer,* 468 Pa. at 117, 360 A.2d at 207, (corporate veil may be pierced whenever one in control of a corporation uses that control or corporate assets to further his personal interests).

*Lumax Industries, Inc. v. Aultman,* 543 Pa. 38, 41–42, 669 A.2d 893, 895 (1995).[8] "Nevertheless, 'a court will not hesitate to treat as identical the corporation and the individuals owning all its stocks and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless.' " *Good v. Holstein,* 787 A.2d 426, 430 (Pa.Super.2001) (quoting *Kellytown Co. v. Williams,* 284 Pa.Super. 613, 426 A.2d 663, 668 (1981)). Stated differently, " '[T]he corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime.' " *Good,* 787 A.2d at 430 (quoting *First Realvest, Inc. v. Avery Builders, Inc.,* 410 Pa.Super. 572, 600 A.2d 601, 604 (1991)).

¶ 43 As this Court also noted in *Good,* "there appears to be no clear test or well settled rule in Pennsylvania . . . as to exactly when the corporate veil can be pierced and when it may not be pierced." *Good,* 787 A.2d at 430 (citations omitted). In the instant case, ATS seeks to pierce the corporate veil of the several Appellee entities using the "alter ego" theory rather than the "enterprise entity" or "single entity theory."[9] This theory is applicable when " 'the individual or corporate owner controls the corporation to be pierced and the controlling owner is to be held liable.' " *Id.* (quoting *Miners,* 722 A.2d at 695). "[T]he alter ego theory is available whenever one party seeks to hold the corporation owner liable for any claim or debt." *Id.*

¶ 44 In its brief, ATS argues in the alternative that it is entitled to either a judgment notwithstanding the verdict (JNOV) or a new trial before a jury concerning the issue of piercing the corporate

---

**8.** The parties do not dispute the trial court's application of Pennsylvania law to this issue, and they acknowledge that the test for piercing the corporate veil is similar under both Pennsylvania and Delaware law. *See Everitt v. Dover Downs Entertainment, Inc.,* 1999 WL 374163 (E.D.Pa.1999).

**9.** Under this theory, piercing the corporate veil applies when "two or more corporations share common ownership and are, in reality, operating as a corporate combine." *Miners, Inc. v. Alpine Equipment Corp.,* 722 A.2d 691, 695 (Pa.Super.1998). ATS pursued its claim against Appellees based upon only the "alter ego" theory. Nevertheless, as noted in *Miners,* the " 'single entity' theory has yet to be adopted in Pennsylvania." *Id.*

veil. As this Court has recently summarized:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case.

*Van Zandt v. Holy Redeemer Hosp.*, 806 A.2d 879, 885–86 (Pa.Super.2002) (citations omitted). "The [finder of fact] may not be permitted to reach its verdict merely on the basis of speculation and conjecture, but there must be evidence upon which logically its conclusion may be based." *Id.* Entry of a JNOV is a "drastic remedy;" "any doubts must be resolved in favor of the verdict winner." *Education Resources Institute, Inc. v. Cole*, 827 A.2d 493, 497 (Pa.Super.2003) (citation omitted).

¶ 45 This Court has summarized our standard of review for denying a motion for a new trial as follows:

> Our standard of review of the trial court's denial of a motion for a new trial is deferential and limited to a determination of whether the trial court abused its discretion or committed an error of law. *Collins v. Cooper*, 746 A.2d 615 (Pa.Super.2000). Furthermore, "[o]ur standard of review in a non-jury trial is clear. We must determine whether the findings of the trial court are supported by competent evidence and whether the trial judge committed error in the appli-

cation of law. Additionally, findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed absent error of law or abuse of discretion." *Stonehedge Square Ltd. v. Movie Merchants, Inc.*, [685 A.2d 1019, 1022 (Pa.Super.1996), *aff'd* 552 Pa. 412, 715 A.2d 1082 (1998) ].

*Good*, 787 A.2d at 429.

¶ 46 ATS argues at length that it established the *Lumax* factors for piercing the corporate veil of the several Appellee entities and, in fact, that the trial court's factual findings support this claim. We conclude, however, that ATS is not entitled to relief under either of the above standards. Rather, although the evidence shows and, as the trial court found, evidence at trial established lack of formalities, the law nevertheless requires that this lack of formalities led to some misuse of the corporate form. *See College Watercolor Group v. Newbauer Inc.*, 468 Pa. 103, 117, 360 A.2d 200, 207 (1976); *see also Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3d Cir.1994) (explaining that "[n]ot every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil"); *Zubik*, 384 F.2d at 274.

¶ 47 ATS argues that the Appellees misused the "corporate form" of the LLC because it used the contract with ATS as leverage in its attempt to close its pending deal with ERI. In support of this claim, it cites *College Watercolor Group, supra*, as an instance where our Supreme Court "did not hesitate to [pierce] the corporate veil" when the defendant in that case employed "[a] similar ultimatum type strategy." ATS's Brief at 38. William H. Newbauer, sole shareholder of Newbauer, Inc., entered into an agreement with College Watercolor Group (CWG) to sell its watercolor reproductions to banks and financial insti-

tutions within a five-state area. According to their agreement, Newbauer, Inc. was to receive a commission for each reproduction sold; the billing of the purchasers was to be done by Newbauer, Inc. and the proceeds were to be turned over to CWG.

¶ 48 Eventually, CWG was unable to produce enough reproductions to meet the demand generated by Newbauer, Inc.'s sales campaign. Newbauer, through his corporation, developed a plan to learn through subterfuge CWG's reproduction method, eventually produced them and sold them under CWG's trademark. During the life of their agreement, Newbauer also became a minor shareholder in CWG. Subsequently, Newbauer expressed an interest in increasing his holding and insisted that CWG's president sell him a controlling interest in CWG. If the transaction did not occur, Newbauer threatened to have Newbauer, Inc. refuse to pay CWG $36,000.00 that the former undisputedly owed the latter from sales.

¶ 49 As a result of an equity action filed by CWG, the trial court, *inter alia,* ordered Newbauer and Newbauer, Inc. to pay CWG the $36,000.00 due as a result of the sale of watercolor products. On appeal, Newbauer contended that the trial court erred in holding him individually liable for this amount by piercing the corporate veil of Newbauer, Inc. In concluding that the trial court's decision to pierce the corporate veil was proper, our Supreme Court stated:

It has been held that the corporate veil is properly pierced whenever one in control of a corporation uses that control or corporate assets to further one's own personal interests. In such circumstances, the shareholder, in effect, pierces the corporate veil by intermin-

gling his personal interests with the corporation's interests.

In this case, it is clear that Newbauer used his control of the corporation in an attempt to further his own personal interests. When he was attempting to gain control of [CWG] by increasing his stockholdings in that corporation, he threatened that Newbauer, Inc., would refuse to pay [CWG] the approximately $36,000.00 due unless the president of [CWG] agreed to sell him a controlling interest in [CWG]. This fact alone supports the conclusion that Newbauer did not keep his personal interests separate from the corporate interests. He used his total control over the corporation in an attempt to gain a personal benefit. Under these circumstances the trial court properly pierced the corporate veil and held Newbauer responsible for the debt of Newbauer, Inc.

*College Watercolor Group,* 468 Pa. at 117, 360 A.2d at 207 (citations omitted).

¶ 50 Unlike the facts of *College Watercolor Group,* in the instant case the "leverage" of which ATS complains occurred not between itself and the LLC, but rather, between the LLC and a third party, ERI. Moreover, ATS could not demonstrate that it was prejudiced by the LLC's use of its contract as leverage because it was used in an attempt to have ERI enter into a separate transaction, which, as the trial court found, all of the parties to this appeal knew was necessary for the success of the LLC.[10]

¶ 51 We are not convinced that the many cases cited by ATS involving piercing the corporate veil require us to conclude that the trial court erred in refusing to apply this equitable doctrine to a limited liability

10. ATS argues that it was unaware that the LLC would be unsuccessful if the deal with ERI fell through, because Savor stated that it was also lining up other customers for the radio channels. Of course, the credibility of the testimony presented at trial was for the trial court. *Good, supra.*

corporation given the transactions, both completed and unsuccessful, that were involved in this case. While ATS cites numerous federal and state cases permitting the piercing of the veil of the corporate defendants, the majority of them involved traditional corporations rather than the "corporate" form known as a limited liability company.

¶ 52 ATS concedes that there are no federal or state decisions under Pennsylvania law which permitted the piercing of the corporate veil of a limited liability company.[11] ATS does cite to three decisions from other states.[12] We find its reliance on these cases to be inapposite as they are factually distinguishable from those present in the instant case or otherwise unpersuasive. *See Stone v. Frederick Hobby Assoc. II, L.L.C.*, 2001 WL 861822 (Conn.Super.2001) (memorandum decision) (granting plaintiff's motion for prejudgment remedy and disclosure of assets because sufficient evidence was proffered that corporate veil of limited liability company could be pierced because, *inter alia*, on or near closing date on newly constructed house the limited liability company transferred substantially all of its assets, including the proceeds of the closing, to other limited liability companies and/or the individual members/shareholders); *Hamilton v. AAI Ventures, L.L.C.*, 768 So.2d 298 (La.App. 1 Cir., 2000) (concluding that district court was not "clearly wrong" in al-

lowing employee of limited liability company to pierce its corporate veil in order to recover promised incentive pay from the financing corporation, but affirming dismissal of individual shareholders); *Great Neck Plaza, L.P. v. Le Peep Restaurants, L.L.C.*, 37 P.3d 485 (Colo.App.2001) (holding that funds in bank account belonging to different company properly garnished to pay judgment creditor where all of the relevant entities were alter egos of each other and funds in the garnished bank accounts resulted from fraudulent transfers). While similarities exist in each of these cases with regard to the relevant *Lumax* factors, the totality of circumstances surrounding the business transaction in the present case, as credited by the trial court and amply supported by our review of the trial testimony, warrant a different result.[13]

¶ 53 After careful review of the record on appeal and the various cases and statutes cited by the parties, as well as conducting our own research regarding limited liability companies, we find that the trial court did not commit an error of law or abuse its discretion in refusing to pierce the corporate veil of the several Appellee entities. We adopt the following statements of the trial court:

> While the instant case was tried over several days and has a large amount of documentary evidence, the end result is

11. ATS correctly notes, however, that the Limited Liability Company Law of 1994 contemplates "that in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company." 15 Pa.C.S.A. § 8904, Committee Comment, 1994.

12. We note that in each of these cases the court determined the corporate piercing issue rather than a jury.

13. ATS also cites *B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65

(3rd Cir.1989), as an instance where the corporate veil was pierced even though there was no evidence of "[s]iphoning off funds of the corporation by the dominant shareholder." *Id.* at 68. The court found the corporate piercing was still appropriate because the corporation "had no funds of its own which could be siphoned." *Id.* We find this case inapposite, as it did not involve similar facts to those of the instant case, *i.e.*, a single purpose business entity whose purpose was never achieved.

rather simple. The facts are that ATS knew it was dealing with [the LLC, a limited liability company], knew [the LLC's] liability is very limited, and admits it knew that [the LLC] "would have assets, and $15 million of financing, once [ERI] signed the various agreements with [the LLC]." (*See* [ATS's] Proposed Findings of Fact No. 26.) Yet when the ERI deal fell through, and ATS, after having received contract payments for six months, was given back its consideration (the 14 radio channels), ATS tried to obtain more protection than it had bargained for. ATS had demanded no guaranties for the [LLC's] obligations yet now it asks the Court, in effect, to provide guaranties after-the-fact. ATS claims, at least implicitly, to have lost the ability to keep on leasing its channels to ERI after that larger deal fell through, yet all ATS had with ERI before March 1999 was a month-to-month agreement that [Beatty], in his uncontradicted testimony, said was not going to continue in any case.

Adjudication, 5/15/02, at 21–22 (footnote omitted). *See Kellytown Company v. Williams*, 284 Pa.Super. 613, 426 A.2d 663, 668 (1981) (citing *Sheetz v. Spagnol*, 224 Pa.Super. 85, 302 A.2d 379, 381 (1973) (reversing trial court's piercing of corporate veil when agreement itself, as drafted by one of the appellees, was valid, entered into voluntarily by the appellees, and shielded the appellant from liability; to allow corporate disregard under these circumstances "would be not preventing an injustice but in fact creating an injustice by allowing [the appellees] to impose upon [the appellant] a liability different than that they agreed to impose on him.")).

¶ 54 Judgment affirmed.