J-A02007-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF EDWARD BREMEN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| PNC BANK AND PNC INVESTMENTS AND DAVID DEBLASIO | |
| | No. 3115 EDA 2015 |

Appeal from the Judgment Entered September 11, 2015
In the Court of Common Pleas of Chester County
Civil Division at No(s): No. 08-00824

| | |
|---|---|
| ESTATE OF EDWARD BREMEN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| PNC BANK AND PNC INVESTMENTS AND DAVID DEBLASIO | |
| APPEAL OF: PNC BANK AND PNC INVESTMENTS | |
| | No. 3178 EDA 2015 |

Appeal from the Judgment Entered September 11, 2015
In the Court of Common Pleas of Chester County
Civil Division at No(s): No. 08-00824

BEFORE:  OTT, J., RANSOM, J., and FITZGERALD, J.[*]

_____

[*] Former Justice specially assigned to the Superior Court.

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 19, 2017**

This appeal and cross-appeal was filed from the judgment entered September 11, 2015, in the Chester County Court of Common Pleas finding in favor of Edward Bremen[1] and against David DeBlasio[2] in the amount of $87,500.00, and in favor of Bremen and against PNC Bank and PNC Investments (collectively "PNC"), in the amount of $43,500.00. The verdicts reflect DeBlasio's theft of funds from Bremen's accounts, to which DiBlasio gained access while he was employed as a broker for a PNC affiliate and

_____

[1] We note that on June 1, 2016, Appellees, PNC Bank and PNC Investments, filed a Suggestion of Death indicating Bremen had died on April 18, 2016. Neither of Bremen's attorneys of record responded to the Suggestion of Death. After investigation, this panel learned that no Estate had been raised. Consequently, on January 17, 2017, this panel entered an order precluding either of Bremen's attorneys from participating in oral argument scheduled for January 24, 2017. Thereafter, on January 23, 2017, attorney for Bremen, Albert M. Sardella, Esq., filed a Motion for Special Relief acknowledging Bremen's death, and explaining an Estate was not raised because Bremen had no assets or property. *See* Motion for Special Relief, 1/23/2017, at ¶¶ 8-9. Sardella further averred he was a named co-executor under Bremen's will, but was unable to raise an Estate prior to arguments due to the unavailability of the other co-executor. *Id.* at ¶ 9, 17. He nonetheless requested permission to participate in oral argument. This panel granted Sardella's motion, and on January 26, 2017, entered an order directing Sardella to "(1) probate the Last Will and Testament of Edward Bremen, and (2) file[] with the Prothonotary of this Court a short certificate indicating he is the executor or co-executor of the Estate of Edward Bremen" within 30 days of oral argument. Order, 1/26/2017. Sardella complied with this court's directive, and filed a short certificate on February 23, 2017.

We have changed the caption to reflect the appellant/cross-appellee is the "Estate of Edward Bremen." For ease of discussion, however, we will refer to appellant/cross-appellee as "Bremen" in this memorandum.

[2] DeBlasio is not a party to this appeal.

cultivated a personal relationship with Bremen. Bremen raises four issues in his appeal, arguing the trial court erred in: (1) concluding PNC had no duty to Bremen after DeBlasio resigned; (2) finding PNC did not aid or abet DeBlasio in his thefts, conceal his crimes, or lie to authorities; (3) violating the coordinate jurisdiction rule by failing to enforce discovery orders issued by another judge; and (4) failing to award punitive damages. In its cross-appeal, PNC contends the trial court erred in awarding Bremen damages based on a theory that was not supported by the evidence, and was barred by the statute of limitations. For the reasons below, we affirm in part and reverse in part.

The facts underlying this appeal are as follows. Bremen was a longstanding customer of PNC, and at all relevant times, elderly, infirm, and functionally blind. DeBlasio was a broker for a PNC affiliate, Hilliard Lyons, from 1994 until his resignation in November of 2003. At some point, DeBlasio began to manage Bremen's portfolio, and cultivated a personal relationship with Bremen. DeBlasio often visited Bremen at his home and, eventually, began to help balance his checkbook, and read him his mail.[3]

In late October of 2003, PNC received a complaint from one of DeBlasio's clients concerning missing interest on her brokerage account.[4] PNC investigated the complaint and suspected DeBlasio misappropriated funds

---

[3] DeBlasio testified no one at PNC knew he was going to Bremen's home. **See** N.T., 3/4/2014, at 100-101.
[4] The client who initially reported DeBlasio was not Bremen.

from the account.[5]  After a meeting with PNC's Human Resources Department, DeBlasio was placed on administrative leave on November 7, 2003.  He subsequently voluntarily resigned five days later, on November 12, 2003.  Shortly thereafter, PNC sent a letter to DeBlasio's clients which stated, in relevant part:

> In order to provide you with the superior customer service you have come to expect, I am writing to you today on behalf of PNC Investments.  As you may be aware, your Financial Consultant, David DeBlasio, has recently left our firm.  We would like to take this opportunity to provide assurance that you will continue to receive the same exceptional service from PNC Investments in the future.

N.T., 3/6/2014, at 188, D-4, November 2003 Letter (hereinafter "November Letter").  The November letter, signed by PNC Regional Sales Manager Paul Krus, further informed the clients that their accounts were in the process of being assigned to a new consultant, and instructed the clients to call him if they had any question "about the activity in [their] account" or if they wanted to discuss their experience with DeBlasio.  *Id.*  PNC did not disclose DeBlasio was under an internal investigation for possible misappropriation of funds.

As its investigation continued, PNC discovered DeBlasio had, indeed, stolen money from several clients' accounts.  With regard to Bremen, PNC

---

[5] The PNC employees who were involved in the ensuing investigation were Customer Complaint Program Manager Susan Meyers, Fraud Investigator Christine Harris, and Compliance Security Specialist Debra Kiss.  The depositions of all three women were introduced at trial, and, both Meyers and Harris also testified at trial.  *See* N.T., 3/4/2014, at 6-9 (admitting deposition transcripts); N.T., 3/5/2014, at 13-94 (testimony of Meyers), and 96-138 (testimony of Harris).

learned DeBlasio took $10,000.00 from Bremen's savings account, but later replaced it with $10,000.00 from another client's account. *See* N.T., 3/6/2014, at 103; Deposition of Susan Meyers, 2/20/2013 ("Meyers' Deposition") at 148-149. PNC uncovered no other irregularities or suspicious activities on Bremen's accounts. *See* N.T., 3/6/2014, at 104. *See also id.* at 83 (Meyers testifying "we determined there was no loss in Mr. Bremen's account"). Complaint Manager Meyers testified her investigation revealed DeBlasio misappropriated $123,000.00 from his clients' accounts, and that PNC later reimbursed all of the customers who suffered a loss. *See id.* at 92, 106. *See also* Meyers' Deposition, at 121 (Meyers stating: "[O]ur first and foremost [job] was to jump in, try to find the impacted clients and make them whole"). Meyers further explained the clients, who were refunded, were subsequently notified "that there were irregularities found in the account and we refunded the moneys." N.T., 3/6/2014, at 93. Bremen, therefore, was never informed of the irregularity in his account because he did not suffer a loss. PNC formally reported DeBlasio's misconduct to the FBI in February of 2004, which then began its own investigation of DeBlasio. *See id.* at 99.

While the criminal investigation was proceeding, PNC entered into a non-confidential settlement with him in an attempt to recoup some of the funds it had reimbursed to his former clients.[6] In May of 2005, PNC agreed to accept

---

[6] The FBI was aware of the settlement agreement. *See* N.T., 3/6/2014, at 106.

a compromised settlement of $87,000.00 for the customer claims that were known at that time.[7]  *See id.* at 61, 105-106.  Pursuant to the terms of the agreement, DeBlasio made an initial payment of $43,500.00 to PNC on May 10, 2005.  *See* N.T., 3/4/2014, at 74, Exhibit P-20 (Letter from DeBlasio's attorney to Harris dated 5/10/2005).  It was subsequently discovered DeBlasio stole the funds from Bremen to make that payment.

Unbeknownst to PNC, DeBlasio maintained his personal relationship with Bremen after he resigned.  DeBlasio claimed Bremen received the letter from PNC announcing his resignation, and that he intercepted it while he was reading Bremen's mail.  DeBlasio stated, however, he did explain to Bremen that he had resigned and that PNC would assign Bremen a new broker.[8]  *See* N.T., 3/4/2014, at 53, 102.  DeBlasio offered to continue to help Bremen with his finances, admitting he hoped Bremen "would not go into the branch and then be possibly told of some of the things that were going on."  *Id.* at 54.  Sometime in 2003, Bremen even named DeBlasio as a beneficiary in his will to show his appreciation for DeBlasio's assistance.  *See* N.T., 3/6/2014, at 192-193.

_____

[7] The settlement did not include unidentified future claims.  *Id.* at 105-106.

[8] In fact, DeBlasio asserted Bremen told him he was happy for him, and that DeBlasio "should have left long ago[.]"  N.T., 3/4/2014, at 103.

However, beginning in April of 2005, almost a year and a half **after** he resigned from PNC, DeBlasio misappropriated $112,000.00 from Bremen's accounts and pension checks.[9]  **See id.** at 149-150.  Although DeBlasio's father repaid some of the stolen funds, Bremen's total loss was $87,900.00.  **See id.** at 150.  In August of 2005, Bremen was contacted by the FBI.  Bremen claimed this was the first time he learned DeBlasio was no longer employed by PNC.[10]  **See** Video Deposition of Edward Bremen, 3/23/2012 ("Bremen Deposition"), at 79-80.[11]

Thereafter, Bremen removed DeBlasio from his will.  On October 6, 2005, his attorney, Sardella, sent PNC a letter demanding a "full and detailed accounting" of Bremen's PNC accounts.  N.T, 3/6/2014, Exhibit D-15 (Letter from Sardella to PNC dated 10/6/2005).  The letter threatened a lawsuit if the request was denied.  **See id.**  In April of 2006, DeBlasio was indicted by a federal grand jury.  On June 28, 2006, he entered a guilty plea to multiple counts of embezzlement, bank fraud, and wire fraud, which included the 2005

---

[9] This amount was in addition to the $10,000.00 DeBlasio had removed from Bremen's account, and later replaced, while he was employed at PNC.

[10] However, Bremen also testified he "figured [DeBlasio] was let go" by PNC when DeBlasio starting coming to his home in slippers and no longer had an office at the PNC branch.  Video Deposition of Edward Bremen, 3/23/2012, at 104.

[11] Bremen's video deposition was played for the trial court in lieu of Bremen's live testimony.  **See** N.T., 3/3/2014, at 30.

thefts from Bremen. DeBlasio was later sentenced to six years' imprisonment and directed to pay, *inter alia*, $87,901.00 in restitution to Bremen.

On January 23, 2008, Bremen filed a civil lawsuit against PNC Bank and DeBlasio. An amended complaint followed on November 17, 2009, which included additional defendant PNC Investments, and asserted claims of fraud, conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and conversion. The case proceeded to a non-jury trial commencing on March 3, 2014. On June 28, 2014, the trial court entered a decision in favor of Bremen and against DeBlasio in the amount of $87,900.00, and in favor of Bremen and against PNC in the amount of $43,500.00. Thereafter, both Bremen and PNC filed timely motions for post-trial relief, which the trial court denied by order dated August 14, 2015.[12] Judgment was entered by praecipe on September 11, 2015, and this timely appeal and cross-appeal followed.[13]

BREMEN'S APPEAL (3115 EDA 2015)

In his first issue, Bremen contends the trial court erred in concluding PNC owed no duty to him after DeBlasio resigned. **See** Bremen's Brief at 43. When reviewing a trial court's nonjury verdict, we must "determine if the trial court's findings are supported by the evidence or whether the trial court

---

[12] For some reason, the court's June 2014 decision was placed in a case file, and not docketed until April 17, 2015.

[13] The trial court ordered both Bremen and PNC to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Both parties complied with the court's directive in a timely manner.

committed legal error." ***True R.R. Assocs., L.P. v. Ames True Temper, Inc.***, 152 A.3d 324, 338 (Pa. Super. 2016) (quotation omitted).

Here, Bremen argues he was in a confidential and/or fiduciary relationship with PNC, and the bank was aware of his "condition" and knew DeBlasio visited him at his home. ***See id.*** at 43, 45-46. He insists this relationship "created a duty on the part of the PNC entities to at least warn [him] that DeBlasio was a thief and not to be trusted." ***Id.*** at 48. However, Bremen states that even after discovering DeBlasio was preying on his elderly clients and stealing their money, PNC "misrepresented in the form letter sent to all of his clients … that DeBlasio – then a known thief – had provided 'exceptional service' to his clients[.]" ***Id.*** at 46. He asserts: "The trial court erred in concluding a financial institution that conceals its employee's theft and then releases him into the world with nothing more than a notice that he no longer works there which praises him as 'exceptional' has no further duty to protect its customers from further theft by the employee."[14] ***Id.*** at 49. Bremen also maintains he is entitled to an equitable accounting "to ascertain the correct amount of his damages." ***Id.*** at 47.

The trial court succinctly addressed this claim as follows:

_____

[14] We note Bremen's characterization of the letter PNC sent to its customers announcing DeBlasio's resignation is somewhat misleading. As quoted *supra*, the letter assured DeBlasio's clients that they would "continue to receive the same exceptional service from PNC Investments in the future." November Letter. It did not specifically praise DeBlasio, himself, as an "exceptional" employee.

Bremen brought this suit against PNC to recover monies stolen by DeBlasio **after** DeBlasio was an employee of PNC and at a time when Bremen knew that DeBlasio was not an employee of PNC.

On these facts, we held that PNC had no duty to Bremen to take action which would have prevented DeBlasio's actions after DeBlasio was no longer an employee of PNC. Given that Bremen viewed DeBlasio very favorably and PNC rather unfavorably, it is arguable that nothing PNC could have done would have altered the outcome. Nevertheless, we did assume that if PNC had specifically advised Bremen of DeBlasio's thefts of client monies, including Bremen's own money, while DeBlasio was an employee of PNC, it might have deterred Bremen from allowing DeBlasio access to Bremen's accounts. We had found no authority – and Bremen has cited to us no authority – for the proposition that PNC had a duty to so warn or advise Bremen after DeBlasio was no longer an employee of PNC. We therefore found against Bremen and in favor of PNC[.]

Trial Court Opinion, 2/19/2016, at 4-5 (emphasis added).

Upon our review of the record, the parties' arguments, and the relevant case law, we find no error or abuse of discretion on the part of the trial court. The only thefts proven at trial were those that occurred more than one year **after** DeBlasio resigned from his position at PNC. Bremen's focus on a confidential and/or fiduciary relationship is misplaced. Assuming PNC had a duty to protect Bremen from malfeasance committed by its employee, we find no authority suggesting that PNC's duty extended to the time period when DeBlasio was no longer employed by PNC, or obligated PNC to explicity inform DeBlasio's clients of the reason for his resignation. This Court's decision in **Coath v. Jones**, 419 A.2d 1249 (Pa. Super. 1980), is instructive.

In **Coath**, the plaintiff was raped in her home by a former employee of the defendant electrician. **See id.** at 1250. The employee had serviced the

plaintiff's home on a number of prior occasions while he was employed by the defendant. *See id.* He gained entrance to the home on the day of the crime "by representing he was there at defendant's direction and on defendant's business[,]" although he was no longer employed by defendant at that time. *Id.* The plaintiff filed a complaint against the defendant based on his negligent hiring of the employee, which the trial court dismissed on preliminary objections in the nature of a demurrer. *See id.* at 1249.

On appeal, a panel of this Court reversed, finding the plaintiff's allegations were sufficient to state a cause of action. First, the panel determined that the defendant/employer could be found liable for negligent hiring "if [the employee] was known to have the inclination to assault women or if the defendant should have known that." *Id.* at 1250.

Second, and relevant to the issue raised herein, the panel considered whether the defendant's potential negligence ceased when the employee was discharged. *See id.* The panel noted that "[a]s a general rule the giving of a warning does not relieve one of negligence but under certain situations a warning may relieve or terminate negligent conduct." *Id.* at 1251 (footnote omitted). In considering the facts before it – particularly that the defendant provided no notice to its customer that the employee was no longer employed by the company – the panel held that the plaintiff alleged sufficient facts "which could support defendant's liability." *Id.* at 1252. The panel opined:

> From all this we believe that if the defendant were negligent in selecting [the employee] as an employee and if it were foreseeable by the defendant that [the employee], even though

- 11 -

he was discharged as an employee, could attack a customer because he had, on a previous occasion, been admitted to her home on the employer's business, then there would exist a special relationship between defendant and the customer and **a duty on the employer to give a reasonable warning to the customer**.

*Id.* (emphasis added). With regard to the appropriate type of warning warranted, the panel explained in a footnote:

The type of warning required under these circumstances might be that [the employee] was no longer employed. All that is required is a reasonable warning be given.

*Id.* at 1251 n.3.

Here, the evidence presented at trial established PNC informed DeBlasio's clients, including Bremen, that DeBlasio was no longer employed by the company. *See* N.T., 3/6/2014, at 19. Although Bremen claimed he did not receive that notice, PNC presented proof that it mailed the letter to Bremen. *See* N.T. 3/6/2014, at 19 (Meyers confirming the letter was sent to Bremen); 188, Exhibit D-5 (list of customers who received DeBlasio resignation letter). Moreover, DeBlasio confirmed Bremen received the letter, but due to his poor eyesight, Bremen "probably did not read it himself." N.T., 3/4/2014, at 53. Rather, DeBlasio claimed they "spoke of it" and he told Bremen he was "totally separated" from PNC, but "offered to continue to help" Bremen with his financial affairs. *Id.* at 54. Pursuant to the reasoning in **Coath**, we are compelled to conclude PNC's notice to its customers was a "reasonable warning" under the circumstances. **Coath**, *supra*, 419 A.2d at 1251 n.3. Bremen provides no authority to the contrary.

Furthermore, there was no evidence that PNC knew the extent of DeBlasio's infiltration into Bremen's financial affairs,[15] and, particularly, that DeBlasio continued to have a relationship with Bremen after he resigned from PNC. **See** N.T., 3/6/2014, at 26, 40 (Meyers testifying that no one at PNC knew DeBlasio was "still dealing with Bremen" after he resigned); Deposition of Debra Kiss, 3/27/2013 ("Kiss Deposition"),[16] at 70-71 (Kiss stating that during her investigation, she was unaware DeBlasio continued contact with Bremen after his resignation). There was simply insufficient evidence to establish PNC should have known that DeBlasio would continue his relationship with Bremen, and, in fact, continue to steal from him, after DeBlasio resigned from PNC **and** while he was under investigation. Indeed, DiBlasio met with compliance representatives from PNC in April of 2004 "in an effort to find every customer" that DeBlasio stole from so that PNC could reimburse their accounts. N.T., 3/6/2014, at 58. Although DeBlasio testified he was not aware he was under FBI investigation at that time, he thought it was a "foregone assumption" that he might be criminally prosecuted. N.T., 3/4/2014, at 70-72.

---

[15] DeBlasio testified no one at PNC knew he was going to Bremen's home and opening Bremen's mail. **See** N.T., 3/4/2014, at 100-101. Although Bremen claimed that "[s]omebody at PNC Bank knew" DeBlasio was helping him with his checkbook and bank accounts, he did not provide specific details. Bremen's Deposition at 125.

[16] Kiss's deposition was marked and admitted into evidence during the second day of trial. **See** N.T., 3/4/2014, at 8-9.

Moreover, both Bremen and PNC presented the testimony of forensic accounting experts regarding PNC's response to DeBlasio's misconduct. Bremen's expert, Luis Rivera, opined that PNC's notice to its customers following DeBlasio's resignation was "substantially inadequate to really address the substance of the problem with Mr. DeBlasio" because it failed to "inform the customer of what really was happening[.]" N.T., 3/5/2014, at 81. Conversely, PNC's expert, William Krieger, testified:

> In terms of PNC's investigation and reporting related to the asset misappropriation, I believe their work was adequate, reasonable, in fact, thorough in terms of the work that they did in reviewing and investigating and reporting those activities.

N.T., 3/6/2014, at 144. The trial court later specifically inquired about the adequacy of the letter PNC sent to DeBlasio's clients in November of 2003:

> THE COURT: But my question is, when a financial institution becomes aware that it has or had an employee who stole from some of its clients, that financial institution, in your view, never has an obligation to notify other of its clients whose accounts were handled by the now-identified thief, to suggest, for instance, that they carefully examine their statements or that their service might have been something they wouldn't consider to be exceptional service, as long as the particular client isn't identified by the financial institution as having suffered a loss, the financial institution never has an obligation to notify any of its clients whose accounts were handled by the person who has been identified as having stolen from other clients? The financial institution never has any such obligation, is that your opinion?
>
> [KREIGER]: I think, again, it's based on a premise that the bank never notifies. This is a very strict regulatory environment –
>
> THE COURT: Excuse me –
>
> [KREIGER]: -- surrounding –

- 14 -

THE COURT: -- I'm asking you your opinion as to whether or not, under the circumstances I've described, the financial institution has an obligation to notify its customers directly and not by its filings with regulatory agencies, to notify the customers directly of the facts that have become known to the financial institution concerning the illegal activity of one of its employees who was in charge of and with whom they worked? You're saying they don't have an obligation ever?

[KREIGER]: **They don't have that obligation.** They are obliged to do their filing, and as a result that information becomes public and results in individuals like Mr. DeBlasio no longer being permitted to practice in the industry.

*Id.* at 182-184 (emphasis supplied).

Accordingly, the trial court's determination that PNC fulfilled its duty to Bremen when it informed him that DeBlasio had resigned is also supported by expert testimony. The fact that Bremen's expert disagreed with that conclusion was a credibility determination for the fact-finder, in this case the trial court, to resolve. *See Brown v. Trinidad*, 111 A.3d 765, 771-772 (Pa. Super. 2015) ("It is beyond argument that the fact-finder is free to accept or reject the credibility of both expert and lay witnesses, and to believe all, part or none of the evidence.") (quotation omitted).

Therefore, we find PNC's notification to Bremen, informing him that DeBlasio was no longer an employee of PNC, was sufficient to relieve PNC of any culpability with regard to subsequent thefts. Indeed, PNC fulfilled its duty to Bremen by placing DeBlasio on leave immediately upon learning of possible misappropriations, investigating his thefts from PNC clients, and reporting to and cooperating with authorities. When DeBlasio resigned before PNC had the

opportunity to fire him, PNC properly informed DeBlasio's clients that he was no longer with the company. Consequently, no relief is warranted.

In his second issue, Bremen contends "[t]he trial court also erred in failing to find that the PNC entities were actively involved in DeBlasio's malfeasance after his termination." Bremen's Brief at 50. Bremen accuses PNC of: (1) providing "false, misleading and or incomplete information to the various authorities investigating DeBlasio[;]" (2) destroying or withholding evidence of his thefts, and "deliberately provid[ing] false testimony to the authorities under oath and by affidavit[;]" (3) permitting DeBlasio "to continue in his position of trust" at PNC despite numerous conduct violations; and (3) agreeing to conceal the extent of DeBalsio's crimes from his victims and law enforcement. *Id.* at 50-51.

PNC asserts, and we agree, that Bremen has provided no record support for his accusations that PNC lied to authorities, withheld or destroyed evidence, or attempted to conceal Bremen's crimes.[17] *See id.* at 50-52. Although the record does establish DeBlasio was subject to several conduct violations in 1999 and 2000, and was placed on "heightened supervision" in November of 2000, PNC's forensic accounting expert, Krieger, testified that

---

[17] In his reply brief, Bremen attempts to rectify this omission by citing to more than 100 pages in the reproduced record. *See* Bremen's Reply and Response Brief at 8. However, his citations refer to a Petition for Extraordinary Relief filed December 12, 2011, with accompanying exhibits, and various PNC documents stamped "Confidential." A review of these documents reveal none of them demonstrate that PNC lied to authorities, withheld or destroyed evidence, or attempted to conceal DiBlasio's crimes.

none of the complaints prior to 2003 involved theft; rather, "[t]hey were the general nature of issues with communication; failure to respond; suitability of investments." N.T., 3/6/2014, at 145-146. In fact, Krieger stated his review revealed "no indication that there was a mishandling of customers' assets" during the time DeBlasio was on heightened supervision. *Id.* at 178. With regard to PNC's investigation of the claims in 2003, and its subsequent cooperation with authorities, Krieger concluded PNC acted properly:

> They immediately initiated the investigation with the idea that I would do in a similar investigation, which was to understand the depth and breadth of the fraud that had been perpetrated. They took efforts to identify the amounts that were stolen; made an effort to make restitution to those that suffered losses; reported their findings both initially and throughout the process to regulatory authorities; notified customers of the departure of Mr. DeBlasio; sought out to have him prosecuted for his activities; reported and cooperated with the authorities throughout.

*Id.* at 147.

However, Bremen's expert, Rivera, concluded that "the reporting of PNC to regulatory agencies regarding the misconduct of Mr. DeBlasio over the period of 2009 through 2003 was inappropriately or not reported at all." N.T., 3/5/2014, at 66. Further, Rivera opined:

> [DeBlasio's] pattern of conduct, in my investigative experience, really represents a series of red flags that PNC should have been aware of and that should have told PNC that that conduct needed to be reported to regulatory agencies, because there wasn't just one incident, there were several incidents.

*Id.* at 75. Moreover, as noted *supra*, Rivera found PNC's notice to its customers regarding DeBlasio's resignation "substantially inadequate[.]" *Id.*

at 81. Under cross-examination, Rivera acknowledged that none of the pre-2003 complaints involved theft, although he did state they involved "[m]issing funds[,] .. [m]issapropriation of funds[,] … [f]unds that were sent someplace else or wouldn't appear, or investments that were made outside of the scope of the customer's wishes." *Id.* at 88-89.

The trial court determined the evidence did not support Bremen's allegations that PNC colluded with and/or covered-up DeBlasio's thefts. Although the experts disagreed with respect to PNC's culpability, the trial court, as fact-finder, was free to accept or reject their opinions. *See Brown*, *supra*. The court's conclusion that PNC acted appropriately once it learned of DeBlasio's malfeasance is supported by the record. *See True R.R. Assocs., L.P.*, *supra*. Therefore, again, Bremen is entitled to no relief.

Next, Bremen contends the trial court violated the coordinate jurisdiction rule by refusing to enforce discovery orders issued by a prior judge.[18] Bremen claims that by refusing to enforce the orders or rule on his motion for sanctions, the trial court "essentially nullif[ied] the discovery orders" and enabled PNC to avoid compliance. Bremen's Brief at 54. He further asserts:

> The PNC entities never explained their failure to provide financial records for the years in question, their failure to provide relevant internal records and communications concerning their obligation

_____

[18] As we will discuss *infra*, Bremen claims PNC failed to comply with discovery orders issued by a prior judge in August and November of 2013, and that the trial court violated the coordinate jurisdiction rule when it failed to sanction PNC's non-compliance before trial.

to report suspicious activity under the Bank Secrecy Act …, and their failure to respond to Bremen's request for admissions. This highly prejudiced Bremen, because the discovery was important to further confirm the validity of his claims and because the failure to respond to the requests for admissions constitutes judicial admission by the PNC entities of the requested admissions. The trial court erred in refusing to conduct a pretrial conference to resolve the outstanding discovery orders and requests for admissions, and Bremen was prejudiced at trial and unfairly surprised by the variance between what was set forth in the PNC entities' trial memorandum and what they adduced at trial.

Bremen's Brief at 54.

The coordinate jurisdiction rule prescribes that "judges of coordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other." ***Boyle v. Steiman***, 631 A.2d 1025, 1031 (Pa. Super. 1993) (quotation omitted), *appeal denied*, 649 A.2d 666 (Pa. 1994).

The purpose of this rule is to ensure a degree of pretrial finality "so that judicial economy and efficiency can be maintained". Absent some new evidence, it is improper for a trial judge to overrule an interlocutory order of another judge of the same court in the same case. However, an exception exists where new evidence is placed on the record in the interim between the first trial court judge's ruling and the second trial court judge's reassessment.

***Id.*** (internal citations omitted).

Once again, Bremen fails to identify in the argument section of his brief the specific orders that he claims the trial court failed to enforce. Although he does reference the reproduced record in his Statement of the Case, most of those citations are directed to his motion to compel discovery, and not to the court's orders or PNC's responses. ***See*** Bremen's Brief at 5-6. Considering the voluminous certified record in this appeal, Bremen's omissions could

- 19 -

constitute waiver of his claim.[19] **See** Pa.R.A.P. 2119(c) ("If reference is made to … any … matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears"). **See also J.J. DeLuca Co. v. Toll Naval Assocs.**, 56 A.3d 402, 413 (Pa. Super. 2012) (finding claim that plaintiff failed to show defendant "actively concealed fraud" so as to toll the statute of limitations waived under Rule 2119(c) when defendant neglected to "present any citation to the record to support its claim, or to show where [plaintiff's] evidence was deficient.").

Nevertheless, from what we can discern, Bremen primarily claims PNC failed to comply with discovery orders issued by another trial court judge on August 30, 2013, and November 13, 2013. The August 30th Order directed PNC to "preserve, maintain, protect and produce … all of the computer data, documents, and things potentially relevant to the facts and causes of action" alleged in Bremen's complaint or identified in his discovery requests. Order, 8/30/2013, at ¶ 1. When Bremen later claimed PNC failed to comply with the August 30, 2013, order, the court conducted a hearing on November 1, 2013. Following the hearing, the court entered an order on November 13th directing PNC to provide, *inter alia*, "all PNC or predecessor account records of [Bremen] for all accounts from 1995 to account closure" "[o]r when [Bremen] first

---

[19] While Bremen attempts to rectify this in his reply brief, and identifies the information that was not provided, he again fails to include any citations to the record. **See** Bremen's Reply and Response Brief at 10-12.

became a customer of PNC or its predecessors, or an explaination as to why those records not longer exist and when and why those records cease to exist." Order, 11/13/2013, at 1, and n.1. The order also required PNC to produce "all contents of Defendant DeBlasio's PNC computer hard drive relating to [Bremen's] accounts." *Id.*

PNC responded to the November 13th order in three letters, dated November 13, 2013, November 15, 2013, and December 2, 2013. PNC explained most of the requested records had been turned over in 2009, and any missing bank account records either could not be located or were destroyed pursuant to the Bank's record retention policy. *See* Letter, 12/3/2013, PNC to Bremen. Unsatisfied with PNC's response, Bremen filed a Motion to Compel and for Sanctions on February 27, 2014, four days before the scheduled bench trial.

On the first day of trial, Bremen alerted the trial court of the outstanding motion, and argued, specifically, that PNC failed to provide an accounting and its computer hard drives. *See* N.T., 3/3/2014, at 25, 31. Bremen argued that, without the requested paperwork, "we can't determine our damages or losses[.]" *Id.* at 32. PNC maintained, however, that it "complied in full" with the discovery orders. *Id.* at 24. With regard to the hard drives in particular, PNC stated the court did not require it to produce the hard drives for inspection, but rather, directed it to turn over "any materials from the hard drive that had anything to do with Mr. Bremen, and there was none." *Id.* at 27.

Accordingly, we find no basis to conclude the trial court violated the coordinate jurisdiction rule. Indeed, the court did not overrule a prior discovery order. Rather, it inquired whether PNC had complied with the previous court's order and accepted counsel's averment that PNC had done so. Indeed, Bremen knew no later than December 3, 2012, that PNC believed it had complied with the court's order in full. Nevertheless, he waited until nearly three months later, and four days before trial, to file a motion for sanctions. Bremen has failed to demonstrate any error or abuse of discretion on the part of the trial court.

In his last issue, Bremen contends he is entitled to an award of punitive damages against PNC. He claims "[t]he record demonstrates that the PNC entities engaged in outrageous conduct whith, at a minimum, reckless indifference to the rights of others." Bremen's Brief at 55.

In reviewing Bremen's assertion that the court erred in failing to award punitive damages, we must bear in mind the following:

> "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. The purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct. Additionally, this Court has stressed that, when assessing the propriety of the imposition of punitive damages, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious."

***Hutchison ex rel. Hutchison v. Luddy***, 870 A.2d 766, 770–771 (Pa. 2005)

(internal citations and footnote omitted).  Furthermore,

> [i]t is settled law that one cannot recover punitive damages independently from an underlying cause of action.  ***See Hilbert v. Roth***, 395 Pa. 270, 149 A.2d 648 (1959) (punitive damages are incident to underlying cause of action, not the subject of the action itself).   In ***Kirkbride v. Lisbon Contractors, Inc.***, 521 Pa. 97, 101, 555 A.2d 800, 802 (1989) (emphasis in original), our Supreme Court reiterated this principle as follows, "If no cause of action exists, then no independent action exists for a claim of punitive damage since punitive damages is only an element of damages."

***DiGregorio v. Keystone Health Plan E.***, 840 A.2d 361, 370 (Pa. Super.

2003).

Here, Bremen's request for punitive damages is based on his allegations that PNC failed to take precautions to prevent DeBlasio's thefts, conspired with DeBlasio to conceal his thefts, and failed to report his actions to authorities or warn his clients.  ***See*** Bremen's Brief at 55-56.  However, as discussed *supra*, the court did not award Bremen relief on any of these claims.  Because the trial court found Bremen failed to prove PNC was liable under any cause of action raised in his amended complaint, or that PNC, in fact, engaged in any of the outrageous conduct he alleges, Bremen is not entitled to an award of punitive damages.[20]  ***See DiGregorio***, ***supra***.  Consequently, his fourth and final claim fails.

---

[20] As noted previously, the court did award Bremen damages for a cause of action not raised in his brief, that is, for money had and received.  However, as we will discuss next, we conclude the court erred in finding PNC liable to Bremen under this theory.

- 23 -

PNC'S CROSS-APPEAL (3178 EDA 2015)

PNC raises two, related issues in its cross-appeal: whether the trial court erred in granting judgment in favor of Bremen under a theory of "money had and received," when the cause of action was (1) unsupported by the evidence, and (2) barred by the statute of limitations. ***See*** PNC's Brief at 36-45.

A party may assert a cause of action for money had and received "where money is wrongfully diverted from its proper use and that money subsequently falls into the hands of a third person who has not given valuable consideration for it." ***Solomon v. Gibson***, 615 A.2d 367, 369 (Pa. Super. 1992), *citing* ***Brubaker v. County of Berks***, 112 A.2d 620 (Pa. 1955). However, "[t]he cause of action fails … where the recipient of the money has given consideration in exchange for the funds and is unaware that the money was procured by fraudulent means." ***Id.***

It is important to note that Bremen did not assert a cause of action for money had and received in his amended complaint. Rather, the claim was first raised by PNC during closing arguments in response to testimony at trial indicating that DeBlasio paid a portion of his PNC settlement with funds stolen from Bremen. ***See*** N.T., 3/6/2014, at 219-220. PNC asserted the cause of action was not applicable because the facts were "clear and unambiguous" that PNC gave consideration for the payment and "had no idea … that Mr.

DeBlasio was going to steal money from Mr. Bremen in the future."[21]  ***Id.*** at 221.

Nevertheless, the trial court concluded PNC was liable to Bremen based on a cause of action for money had and received in the amount DeBlasio stole from him to pay the PNC settlement.  The court opined:

> We found that PNC had at a minimum **constructive knowledge** that the funds paid to it by DeBlasio were stolen from a PNC client. If PNC did not have such knowledge it is because PNC was willfully ignorant of that fact, putting blinders over its eyes and earplugs in its ears to avoid seeing or hearing what was obvious to all. Being aware that DeBlasio had a history of stealing from PNC clients while DeBlasio was an employee of PNC, PNC was on notice that DeBlasio probably did not have any source of funds other than by theft from PNC clients and with but a minimal investigation PNC would have discovered the actual fact that the funds at issue were stolen by DeBlasio from Bremen.
>
> \* \* \* \*
>
> We find that the facts and circumstances surrounding the payment of this money by DeBlasio to PNC screamed out the fact that the money had been stolen by DeBlasio and that at a minimum PNC was bound to conduct an investigation as to the source of the funds before PNC accepted them.

Trial Court Opinion, 2/18/2016, at 2-3 (emphasis supplied).

Our review, however, reveals no factual basis to support the court's conclusion.  First, we note there appears to be no dispute that PNC gave DeBlasio "consideration in exchange for the funds."  ***Solomon***, ***supra***, 615

---

[21] Contrary to Bremen's assertion in his brief, PNC did not ask the court to enter a ruling on this cause of action.  ***See*** Bremen's Reply and Response Brief, at 3.  Rather, PNC discussed the theory because the trial court had commented on it the day before when denying PNC's motion for a compulsory nonsuit.  ***See*** N.T., 3/5/2014, at 141-142.

A.2d at 369. Under the settlement agreement, PNC agreed to accept a compromised payment in exchange for DeBlasio's release from liability to PNC for claims known at that time. *See* N.T., 3/5/2014, at 49, Exhibit P-20 (Settlement Agreement & Release, 5/6/2005).

Second, with regard to the court's finding that PNC had "constructive knowledge"[22] of the source of the funds, we note the PNC employees testified they had no knowledge DeBlasio continued to have a relationship with Bremen after he resigned from PNC. *See* N.T., 3/6/2014, at 26, 40; Kiss Deposition at 70-71. Indeed, at the time of the settlement in May of 2005, DeBlasio was still under investigation by the FBI, which was aware of the non-confidential settlement, and DeBlasio was represented by counsel. *See* N.T., 3/6/2014, at 106. Both PNC Complaint Manager Myers and Fraud Investigator Harris denied any knowledge that DeBlasio might steal funds from Bremen to pay the negotiated amount. *Id.* at 63, 108. Rather, when asked if she knew where DeBlasio was "getting the money to pay PNC," Harris replied:

> There had been talk about a 401K. I believe that we were aware that he had a job, from his attorney, through his attorney, and we knew that he had a home, so we assumed it was one of those avenues.

*Id.* Further, Bremen did not present any evidence indicating PNC knew, or should have known, that DeBlasio would steal the money to satisfy the settlement agreement.

_____

[22] Trial Court Opinion, 2/18/2016, at 2.

Accordingly, while the trial court, as fact-finder, was entitled to find the testimony of PNC's employees less than credible, it was not permitted "to reach its verdict merely on the basis of speculation and conjecture[.]" ***Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC***, 846 A.2d 1264, 1279 (Pa. Super. 2004) (quotation omitted), *appeal denied*, 859 A.2d 767 (Pa. 2004). Rather, "there must be evidence upon which logically its conclusion may be based." ***Id.*** (quotation omitted). Here, although PNC learned DeBlasio had misappropriated funds from several of his clients over a period of years, we find it was purely conjecture for the trial court to determine that PNC should have anticipated that DeBlasio would steal funds from Bremen to pay the settlement; particularly, when DeBlasio was under federal investigation at that time and represented by counsel. Therefore, we vacate the judgment entered in favor of Bremen and against PNC.[23]

Consequently, for the reasons set forth above, we conclude (1) Bremen is entitled to no relief in his appeal at Docket No. 3115 EDA 2015; and (2) PNC is entitled to relief in its appeal at Docket No. 3178 EDA 2015. Accordingly, we affirm the judgment entered in favor of Bremen and against DeBlasio, and reverse the judgment entered in favor of Bremen and against PNC.

---

[23] Because we conclude the evidence was insufficient to support the court's verdict against PNC, we need not address PNC's second assertion, namely, that the claim is barred by the statute of limitations.

Judgment affirmed in part and reversed in part. Jurisdiction relinquished.

Judge Ransom joins the memorandum.

Justice Fitzgerald notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/19/2017</u>