J-A10040-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHARLES B. CALKINS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF FRANK MARTZ HENRY, JR. | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| JUSTIN WOLK, D.D. DOBBS, LLC, D.E. DOBBS, LLC, RDJD RESTAURANT HOLDINGS, LLC, ROBERT DAMERJIAN, THE DAMERJIAN GROUP, LLC, AND TUSCANY EQUITIES, LLC | : : : : : : : : | No. 2211 EDA 2017 |

Appellants

Appeal from the Judgment Entered June 12, 2017
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  July Term, 2013 No. 770

BEFORE:   GANTMAN, P.J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.:                          **FILED JUNE 26, 2018**

Appellants -- Justin Wolk ("Mr. Wolk"); D.D. Dobbs, LLC ("D.D."); D.E. Dobbs, LLC ("D.E.") (D.D. and D.E. hereinafter collectively "the Dobbs LLCs"); RDJD Restaurant Holdings, LLC; Robert Damerjian ("Mr. Damerjian"); The Damerjian Group, LLC ("Damerjian Group"); and Tuscany Equities, LLC ("Tuscany") -- appeal from the judgment entered June 12, 2017, in favor of Appellee Charles B. Calkins, as personal representative of the Estate of Frank Martz Henry, Jr., and derivatively on behalf of D.D., and against Appellants jointly and severally in the amount of $151,410, plus interest at the statutory rate of 6%, plus counsel fees and costs in the amount of

_____
*   Retired Senior Judge assigned to the Superior Court.

$21,900.93. At the time the judgment was entered, the trial court also granted Appellants' motion for post-trial relief in part, struck delay damages, and ordered that monies that had been placed in escrow by Frank Martz Henry, Jr. ("Mr. Henry"), pending the outcome of this action, were to be included in the $151,410 judgment. We affirm.

This action arises from a dispute amongst individuals who had an ownership interest in The Legendary Dobbs ("the Bar"), a former bar and restaurant that had been located at 304 South Street in Philadelphia. The Bar "rented the physical premises and its own value was based on its liquor license, its goodwill and recreation, its location and its profitability." Findings of Fact & Conclusions of Law ("FOF & COL"), 1/27/17, at 1 ¶ 2; *see also* Trial Court Opinion (TCO), 10/3/17, at 1.

The Bar's liquor license was wholly owned by D.E., which had been formed in May 2010. Appellee's Ex. 4 (JW-4); FOF & COL at 1-2 ¶¶ 1-3. Prior to September 21, 2010, the ownership of D.E. was divided as follows:

- Damerjian Group owned 51% of D.E.;
    - Damerjian Group was owned by Mr. Damerjian and Tuscany;
        - Tuscany was wholly owned by Mr. Wolk;[1]
- D.D. owned 49% of D.E.;
    - D.D. was owned in equal parts by Mr. Henry and Harry Schlacterman ("Mr. Schlacterman").

---

[1] Similar to the transitive property in mathematics, if "Damerjian Group = Mr. Damerjian + Tuscany" and "Tuscany = Mr. Wolk," then "Damerjian Group = Mr. Damerjian + Mr. Wolk." *See* TCO at 2.

*Id.* at 2 ¶ 3; TCO at 2.

The individuals who owned D.E., as of September 21, 2010, by percentage, thus were:

- Mr. Damerjian owned 25.5%;

- Mr. Henry owned 24.5%;

- Mr. Schlacterman owned 24.5%;

- Mr. Wolk owned 25.5%.

FOF & COL at 3 ¶ 7.

On September 29, 2010, Mr. Henry assigned his 50% interest in D.D. to D.E. in exchange for a loan of $20,000. According to Paragraph 3 of their agreement ("Assignment Agreement"),[2] if Mr. Henry repaid the loan within two years, his ownership interest would be returned to him. Appellee's Ex. 8 (JW-7) (D.E. would "take all steps necessary to restore [Mr.] Henry to his full membership in D.D. [] as it existed prior to the execution of" the Assignment Agreement); FOF & COL at 3 ¶¶ 8-9. Mr. Henry repaid the entire $20,000 prior to the due date.

However, in the meantime, Mr. Damerjian and Mr. Wolk, acting on behalf of D.E., sold an interest in D.D. to Evans Capital Group for $200,000.

_____

[2] Mr. Henry, Mr. Schlachterman, and Mr. Wolk signed the Assignment Agreement:  Mr. Henry as an individual; Mr. Schlacterman as both an individual and on behalf of D.D.; and Mr. Wolk on behalf of D.E.  Appellee's Ex. 8 (JW-7).

Notes of Testimony (N. T.), 6/21/16, at 12-13.[3] Mr. Henry hence could not be restored to the position that he was in before he temporarily assigned his interest in D.D. to D.E. Mr. Henry therefore initiated the current action in July 2013. TCO at 3.

> In the complaint, [Mr.] Henry brings the following claims: Count I, Breach of Fiduciary Duty against [Mr.] Wolk and [Mr.] Schlacterman; Count II, Breach of Contract against [Mr.] Schlacterman [and the Dobbs LLCs]; Count III, Intentional Interference with a Contractual Relationship against [Mr.] Wolk, [Mr.] Damerjian, RDJD Restaurant Holdings, LLC, [] Damerjian Group [], and Tuscany . . .; Count IV, Civil Conspiracy against all defendants; Count V, Conversion, derivatively on behalf of D.D.[] and against [Mr.] Wolk, [Mr.] Schlacterman, D.E.[], RDJD Restaurant Holdings, LLC, [Mr.] Damerjian, [] Damerjian Group [], and Tuscany[.]

*Id.* at 4; *accord* Compl., 7/2/13, at 12-18 ¶¶ 48-76.

Pursuant to Count II for breach of contract, the complaint alleged: "Defendants have breached the terms of the Assignment Agreement by both substantially dissipating the assets and funds of D.D.[], and altering the corporate structure of D.D.[]." *Id.* at 14 ¶ 56. Under Count III for intentional interference with a contractual relationship ("intentional interference"), after incorporating all previous paragraphs, *id.* at 15 ¶ 59, the complaint stated:

> [Mr.] Wolk, [Mr.] Damerjian, RDJD Restaurant Holdings, [] Damerjian Group, and Tuscany . . . intentionally interfered with the performance of the Assignment Agreement by encouraging, cajoling, facilitating, and assisting [Mr.] Schlachterman, D.D.[], and D.E.[] in performing the following activities:

---

[3] Mr. Wolk testified that the sale to Evans Capital Group "netted $180,000", but Mr. Damerjian testified that he received $190,000 from Evans Capital Group. *Compare* N. T., 6/21/16, at 12 *with* N. T., 6/22/16, at 34-35.

- 4 -

    a. Dissipating the funds and assets of [the Dobbs LLCs];

    b. Manipulating the corporate structure and activities of [the Dobbs LLCs];

    c. Making improper payments from [the Dobbs LLCs] to unauthorized third parties;

    d. Causing [the Dobbs LLCs] to use corporate funds and assets in ways that benefitted Defendants' personal interests at the expense of [the Dobbs LLCs]; and,

    e. Hiding, obscuring, and otherwise making prohibited transactions difficult and burdensome to detect.

*Id.* at ¶ 61. In response to both Paragraph 56 and 61 of the complaint, Appellants answered: "The averments of this paragraph are a conclusion of law to which no responsive averment is possible." Answer & New Matter, 10/15/13, at ¶¶ 56, 61.

The $20,000 repaid by Mr. Henry was placed into escrow, pending the outcome of the case. Appellee's Ex. 42; FOF & COL at 4 ¶ 10.

In early 2014, "the business" was sold to Ninjabull Holdings and Nina Rumpff for an "expected" payment of $418,000. N. T., 6/21/16, at 88; *accord* Appellee's Exs. 23 (JW-20) to 26 (JW-23).[4] Mr. Damerjian later testified the he did not receive anything from this sale but could not produce a statement as to how the funds from this sale were allocated or distributed. N. T., 6/22/16, at 35, 37-38, 47.

In February 2014, the trial court granted Mr. Henry's motion to compel Appellants to comply with discovery requests. Order, 2/4/14. In March 2014,

---

[4] During his testimony, Mr. Wolk did not clarify what entity he meant by "the business." N. T., 6/21/16, at 88.

Mr. Henry filed a motion for sanctions for Appellants' failure to comply with the February order, which the trial court granted. Mr. Henry's Mot. for Sanctions, 3/11/14; Order, 3/26/14. In April 2014, the trial court found continuing non-compliance with its order; it thus ordered Mr. Damerjian and Mr. Wolk to appear in court. Order, 4/22/14. At the hearing in May 2014, Appellants' counsel requested and was granted leave to withdraw; Appellants were granted a temporary stay to find new counsel. Order, 5/13/14. After the stay was lifted, in October 2014, Mr. Henry sent Appellants a request for admissions. In December 2014, Mr. Henry filed another motion for sanctions, Mr. Henry's Mot. for Sanctions, 12/1/14, and the trial court ordered Mr. Damerjian and Mr. Wolk to pay $8,000 "for failure to comply with prior discovery orders." Order, 12/19/14. In February 2015, Mr. Henry filed another motion to compel answers to discovery requests, Mr. Henry's Mot. to Compel Appellants' Answers to Interrogs. & Resps. to Req. for Produc. of Docs. – Second Set, 2/19/15, which the trial court granted in March 2015. Order, 3/3/15. Mr. Henry then filed another motion for sanctions, which the trial court granted, ordering Mr. Damerjian and Mr. Wolk to pay $500 per day beginning April 3, 2015, until all discovery requests were answered. Mr. Henry's Mot. for Sanctions for Failure to Comply with the Ct.'s Order of Mar. 3, 2015, & Respond to Mr. Henry's Interrogs. & Req. for Produc. of Docs. – Second Set, 3/17/15; Order, 3/31/15.

Mr. Henry died in October 2015. "Charles B. Calkins, as Personal Representative of the Estate of Frank Martz Henry, Jr. was substituted as plaintiff on November 13, 2015." TCO at 4.

"This case was tried as a nonjury trial commencing June 20, 2016 and concluding on June 22, 2016." *Id.* Appellee presented the expert testimony of Francis Charles Musso ("Mr. Musso"), a certified public accountant and business consultant, who is certified in financial forensics, with a master's degree in public administration. Appellee's Ex. 40. Mr. Musso provided a valuation for the Bar of $1,189,500 to $1,391,500, despite the fact that Appellants had "never provided any of the financial information [that he] had requested orally or in writing." N. T., 6/20/16, at 51-52, 111; *accord* Appellee's Ex. 41; *see generally* N. T., 6/20/16, at 95-198; *see also* Appellee's Pre-trial Statement, 11/20/15, at § B. For example, D.E. "had no inventory. Not in the books and records. . . . It is very unusual." N. T., 6/20/16, at 117.

"Evidence at trial specifically showed that [Mr.] Wolk and [Mr.] Damerjian repeatedly used a D.E.[] titled credit card to charge personal expenses and their explanations in court were not satisfactory [to the trial court]." TCO at 2. With the credit card in D.E.'s name, Mr. Wolk purchased jewelry worth $2,000 and a "Beachbody" fitness program, paid between $500 and $2,000 for meals at another sports bar, paid $2,340.07 in parking violation fees, and charged stays in Las Vegas and entertainment expenses that "didn't have anything to do with the business." N. T., 6/21/16, at 49, 51,

60-61, 68; Appellee's Exs. 10 (JW-10) to 12 (JW-12). Mr. Damerjian charged to the corporate credit card: unrelated travel expenses, a gym membership, and tickets from Ticketmaster. N. T., 6/22/16, at 6-9, 15-17; Appellee's Exs. 9 (JW-9) & 11 (JW-11).

"Additionally, the D.E.[] credit card was used to pay business expenses of [] Damerjian Group[.] These charges were unrelated to the [Bar]." TCO at 3. Mr. Damerjian charged unrelated construction for Damerjian Group to D.E.'s corporate credit card. N. T., 6/22/16, at 6-9, 15-17. Furthermore, checks for a total of $90,000 were written from D.E.'s business account to Mr. Damerjian for other undocumented "construction" expenses; Mr. Damerjian was unable to produce any invoices or receipts. N. T., 6/21/16, at 188-89.

"Both [Mr.] Damerjian and [Mr.] Wolk used personal checks to cover business expenses of Dobbs." TCO at 3. Mr. Damerjian and Mr. Wolk paid bills for the corporate credit card with funds from their respective personal bank accounts. N. T., 6/21/16, at 97. Mr. Wolk also testified that he and Mr. Damerjian continuously lent money to the Bar to keep it in business. *Id.* at 108-09.

During Mr. Wolk's testimony, the trial court broached the concept of piercing the corporate veil: "LLCs are corporations that have particular rights . . . unless you want to have a corporate veil pierced." *Id.* at 146. On the

final day of trial, Appellee's counsel stated: "[O]ur point here [is] that they are not respecting the corporate [form]."[5]  N. T., 6/22/16, at 226.

"After reviewing transcripts, [the trial court] entered Findings of Fact and Conclusions of Law on January 27, 2017 and awarded $151,[41]0.00 in favor of [Appellee]."  TCO at 4.  In the Findings of Fact, the trial court stated that it "pierce[d] the corporate veils" of Damerjian Group, Tuscany, and D.E. FOF & COL at 3 ¶ 7.  The trial court further found that "the absence of verifiable financial records renders speculative the valuation ranges of [Appellee's] expert[.]"  *Id.* at ¶ 15.  Instead, the trial court "accept[ed] the testimony of [Mr.] Wolk and [Mr.] Damerjian that they sold [D.E.'s] assets to Evans Capital Group and Nina Rumpff for $200,000 and $418,000 respectively."  *Id.* at 4-5 ¶ 15.  The trial court added these amounts together, for a total value for the Bar of $618,000.  Mr. Henry's ownership interest in the Bar was 24.5%.  *Id.* at 5 ¶ 17.  Twenty-four-and-one-half percent of $618,000 is $151,410 – *i.e.*, the amount of damages awarded by the trial court.

Paragraph 15 of the Conclusions of Law stated:

Therefore, based on the percentage share [Mr. Henry] owned of [D.E.] as of September 21, 2010 and the sales prices accepted by this [trial] court, [Mr. Henry] is awarded $151,410, plus delay damages, plus interest, plus a sanctions award to be determined, from all defendants jointly and severally, excluding RDJD Restaurant Holdings, which was not an owner of [D.E.] at times relevant to this dispute, and also excluding Harry Schlacterman

---

[5] The notes of testimony state " . . . not respecting the corporate for**u**m."  N. T., 6/22/16, at 226 (emphasis added).  We believe that "forum" is a typographical error and have correct it to "form."

who was dismissed from this case upon grant of his motion for non-suit following the completion of trial evidence.

*Id.* at 8-9 ¶ 15.

Defendants [Mr.] Wolk, [Mr.] Damerjian, D.D.[], D.E.[], [] Damerjian Group, [] and Tuscany . . . filed post-trial motions on February 6, 2017. After oral argument, [the trial court] granted [Appellants'] post-trial motion in part and denied it in part. [The trial court's] post-trial Order [dated June 9, 2017, and] docketed on June 12, 2017, struck the delay damages award from paragraph 15 of the Conclusions of Law, and clarified [P]aragraph 10 of our Findings of Fact to explain that the $20,000 originally tendered by [Mr.] Henry to D.E.[] and held in escrow is a part of the total $151,[41]0.00 awarded to [Appellee] at Conclusions of Law [P]aragraph 15. [Appellants'] remaining requests for relief were denied.

TCO at 4. The order stated: "JUDGMENT IS ENTERED in favor of plaintiff Charles B. Calkins, as Personal Representative of the Estate of Frank Martz Henry, Jr. and derivatively on behalf of D.D. Dobbs, LLC[.]" Order, 6/12/17.

In July 2017, Appellants timely filed a notice of appeal. The trial court did not order and Appellants did not file a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellants now raise the following issues on appeal:

1. Where neither the Complaint, nor [Appellee]'s Pre-Trial Statement raised the issue of piercing the corporate veil, and where [Appellants] had no notice that the issue was being litigated at trial, did the trial court err in concluding, on the basis of piercing the corporate veil, that [Appellants] who were not parties to a contract were nevertheless liable for the breach of that contract?

2. Did the trial court err in awarding damages against [Appellants] utilizing a calculation of the value of [Appellee]'s ownership interest in D.D.[] in the absence of substantial credible evidence to support the valuation?

Appellants' Brief at 3 (trial court's answers omitted).

We review an order following a bench trial with the following principles in mind:

Our review in a nonjury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the nonjury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 814–15 (Pa. Super. 2017) (citation omitted) (some formatting added).

**Piercing the Corporate Veil**

Appellants first contend that the trial court erred by "piercing the corporate veil and holding non-parties to the assignment agreement liable for its breach where the issue was not raised in the pleadings or at trial." Appellants' Brief at 11. Appellant argue that they hence "did not have notice or opportunity to defend." *Id.*

"Piercing the corporate veil is a means of assessing liability for the acts of a corporation against an equity holder in the corporation." *Hanrahan v. Audubon Builders, Inc.*, 614 A.2d 748, 752 (Pa. Super. 1992) (citation omitted).

Pennsylvania carries a strong presumption against piercing the corporate veil. The corporate entity should be upheld unless specific, unusual circumstances call for an exception.

- 11 -

Further, when it is appropriate to pierce the corporate veil, it is the shareholder . . . who is held liable[.] . . .

In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder.

*Mark Hershey Farms*, 171 A.3d at 816 (emphasis omitted) (citations omitted) (some formatting added). "[T]here appears to be no clear test or well settled rule in Pennsylvania as to exactly when the corporate veil can be pierced and when it may not be pierced." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. 2004) (citation omitted) (some formatting added). However, some of the factors to consider are: "whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own." *Mark Hershey Farms*, 171 A.3d at 816 (citation omitted).

### Mootness

This issue is moot, because Appellants have not also appealed the trial court's finding that each of the Appellants who was not a party to the contract was further liable to Appellee for intentional interference. The trial court specifically held that, with regard to this intentional interference claim, Appellee "is entitled to the same damages as determined for Count II" – *i.e.*, breach of contract. FOF & COL at 6 ¶ 6. In other words, as the trial court

- 12 -

found Mr. Damerjian and Mr. Wolk[6] each personally liable under the intentional interference claim in Count III for the "same damages as determined for Count II" for breach of contract, and as Appellants have not appealed the damages awarded by the trial court pursuant to Count III, Appellants' first issue on appeal regarding piercing the corporate veil is moot. *See, e.g.*, *First Lehigh Bank v. Haviland Grille, Inc.*, 704 A.2d 135, 138 (Pa. Super. 1997) ("because the jury awarded identical damages for fraud as it did for breach of contract, we need not determine whether the evidence is sufficient to support the finding of both").

*Notice*

Assuming that this challenge were not moot, Appellants' contention that they "did not have notice" that the corporate veil may be pierced and did not have the "opportunity to defend" against piercing the corporate veil is contradicted by the record. Appellants' Brief at 11. Albeit the complaint did not explicitly mention "piercing the corporate veil," it included multiple specific factual averments that would serve as the basis for piercing the corporate veil. The complaint repeatedly asserted that Appellants had dissipated the assets and funds of the Dobbs LLCs. Compl., 7/2/13, at 14-15 ¶¶ 56, 61a. The complaint also maintained that Appellants: "alter[ed]" and "manipulate[ed]"

---

[6] The other parties held liable for the intentional interference claim were: RDJD Restaurant Holdings, LLC; Damerjian Group; and Tuscany. Compl., 7/2/13, at 15-16.

- 13 -

the "corporate structure and finances of D.D."; made "improper payment" from the Dobbs LLCs "to unauthorized third parties"; caused the Dobbs LLCs "to use corporate funds and assets in ways that benefited [Appellants'] personal interests at the expense of" the Dobbs LLCs; and "hid[], obsur[ed], and otherwise ma[de] prohibited transactions difficult and burdensome to detect." *Id.* at ¶¶ 56, 61b-61e. In addition, Appellants effectively admitted each of these factual allegations by pleading in response: "The averments of this paragraph are a conclusion of law to which no responsive averment is possible." Answer & New Matter, 10/15/13, at ¶¶ 56, 61. Appellants cannot now argue that they were not on notice of the factual underpinnings of the veil-piercing theory. *See Vill. at Camelback Prop. Owners Ass'n v. Carr*, 538 A.2d 528, 535 (Pa. Super. 1988) ("reading the complaint as a whole, . . . appellant has sufficiently pleaded the ultimate facts necessary to pierce the corporate veil").

In addition to the notice provided by the factual averments in the complaint, Appellants also had notice that Appellee was seeking facts necessary to pierce the corporate veil, because Appellee sought discovery directly related to the veil-piercing theory. Appellee issued requests for admissions that: each of the Appellants misappropriated corporate funds; the Dobbs LLCs never held meetings, maintained minutes, or kept records of their members' capital accounts; there were no books or records demonstrating authority for withdrawal and transfer of any of the Dobbs LLCs' funds; there

were no records reflecting purported loans between Appellants; Appellants did not keep their finances separates from the Dobbs LLCs; and the individual Appellants participated in the destruction of the relevant business records. Mr. Henry's Mot. for Sanctions, 12/1/14, Ex. "I," Appellee's Req. for Admiss. Directed to Appellants, 10/31/14, at 4-11 ¶¶ 9-33; *see Mark Hershey Farms*, 171 A.3d at 816.

Moreover, during the trial, Appellee's counsel explicitly stated that Appellee's intention was to demonstrate that Appellants were "not respecting the corporate [form]," and the trial court itself cautioned that the corporate veil might be pierced. N. T., 6/21/16, at 146; N. T., 6/22/16, at 226.

Thus, due to the factual averments in the complaint, the requested admissions during discovery, and the statements of Appellee's counsel and the court during trial, Appellants cannot now allege that they had no notice of and were caught unawares by the trial court's decision to pierce the corporate veil. *See* Appellants' Brief at 11; *see also* Compl., 7/2/13, at 14-15 ¶¶ 56, 61; Mr. Henry's Mot. for Sanctions, 12/1/14, Ex. "I," Appellee's Req. for Admiss. Directed to Appellants, 10/31/14, at 4-11 ¶¶ 9-33; N. T., 6/21/16, at 146; N. T., 6/22/16, at 226.

### *Propriety of Piercing the Corporate Veil*

If we were to consider the appropriateness of the trial court's decision to pierce the corporate veil, we would begin by noting that, here, the trial court pierced the corporate veil under the "alter ego" theory. TCO at 2. "The

alter ego theory is applicable where the individual or corporate owner controls the corporation to be pierced and the controlling owner is to be held liable." **Good v. Holstein**, 787 A.2d 426, 430 (Pa. Super. 2001) (citation omitted). "The alter ego theory is available whenever one party seeks to hold the corporation owner liable for any claim or debt." **Advanced Tel. Sys.**, 846 A.2d at 1278 (citation and internal brackets omitted). "[T]he alter ego theory which requires proof (1) that the party exercised domination and control over corporation; and (2) that injustice will result if corporate fiction is maintained despite unity of interests between corporation and its principal." **Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co.**, 53 A.3d 53, 58 n.7 (Pa. Super. 2012) (citation omitted).

In the current action, we agree with the trial court that, for both Damerjian Group and Tuscany, equity required that the traditional insulation of the shareholders – in the current action, Mr. Damerjian and Mr. Wolk, respectively – from personal liability be disregard, because the corporate forms were shams, constituting facades for the operations of their corresponding dominant shareholders. **See Mark Hershey Farms**, 171 A.3d at 816. Both Mr. Damerjian and Mr. Wolk continuously ignored the requisite separation between their personal assets and corporate funds. Both charged personal expenses to a credit card in the name of D.E. N. T., 6/21/16, at 49, 51, 60-61, 68; TCO at 2. Mr. Damerjian also used the D.E. credit card to pay business expenses for Damerjian Group that were unrelated to D.E. N. T.,

6/22/16, at 6-9, 15-17; TCO at 3. Mr. Damerjian and Mr. Wolk also both used personal checks to pay for business expenses for D.E. N. T., 6/21/16, at 97; TCO at 3. Furthermore, Mr. Damerjian wrote checks from the D.E. business bank account to himself for unrelated and undocumented "construction" expenses. N. T., 6/21/16, at 188-89.

We thus conclude that the findings of the trial court are supported by competent evidence and that the trial court did not commit an error in the application of the law when it pierced the corporate veils of Damerjian Group and of Tuscany because the dominant shareholders of both corporations -- Mr. Damerjian and Mr. Wolk, respectively -- failed to observe corporate formalities and used the assets of their corresponding corporations (as well as those of D.E.) as if they were their own. *See Mark Hershey Farms*, 171 A.3d at 814–16.

**Valuation**

Next, Appellants maintain that, when "awarding damages against" them, the trial court erred by using "a calculation of the value of [Appellee]'s ownership interest in D.D.[] that was not advanced by [Appellee], not disclosed prior to or during the trial, and not support[ed] by substantial evidence." Appellants' Brief at 16. Appellants contend that they "were placed on notice that [Appellee]'s damages theory would be based upon Mr. Musso's valuation approach as set forth in his expert report" and take issue with the trial court's conclusion that "Mr. Musso's valuation opinion was too

- 17 -

speculative." *Id.* at 17, 20 (citing FOF & COL at 4 ¶ 15).[7]  Appellants insist that the damages award was instead "cobbled together" by the trial court. *Id.* at 16.

The trial court determined that the value of the Bar "was based on its liquor license, its goodwill and recreation, its location and its profitability." FOF & COL at 1 ¶ 2; *see also* TCO at 1.  The trial court stated:  "Having chronically intermingled [D.E.]'s funds for personal use and for other Damerjian Group[] business projects, both [Mr. Damerjian and Mr. Wolk] purposely tried to obscure the true value of [D.E.]" FOF & COL at 4 ¶ 14.  The trial court also found "that the full membership in D.D.[] is the full value of Mr. Henry's stake in D.D.[] on September 21, 2010.  This represents a 24.5 percent interest in [D.E.]" *Id.* at ¶ 13.

An award of compensatory damages will not be reduced or set aside by a reviewing court unless it is so grossly exorbitant, or so clearly and immoderately excessive, as to suggest unfairness, mistake, passion, partiality, prejudice, or corruption and to shock the court's conscience or sense of justice.  *Davis v. Mullen*, 773 A.2d 764, 766 (Pa. 2001); *Connolly v. Phila. Transp. Co.*, 216 A.2d 60, 64 (Pa. 1966); *City of Phila. v. Phila.*

---

[7] We are perplexed by Appellants' insistence that the trial court should have relied upon Mr. Musso's valuation of the Bar when calculating damages, because the minimum damages award suggested by Mr. Musso was $297,375 – almost double the actual amount awarded by the trial court, $151,410. *Compare* Appellant's Brief at 17, *with* J. Order, 6/12/17.

*Transp. Co.*, 162 A.2d 222 (Pa. 1960); *Flank v. Walker*, 157 A.2d 163, 171 (Pa. 1960).

> Only in an extreme case, where the amount of the verdict is clearly excessive, where it can be definitely said the [fact-finder] abused its discretion, should an appellate court reduce the verdict--and then only to bring the amount within the reasonable limitations of the facts and circumstances of that particular case.

*Huey v. Blue Ridge Transp. Co.*, 39 A.2d 602, 604 (Pa. 1944).

"When reviewing an award of damages we are mindful that . . . the determination of damages is a factual question to be decided by the fact-finder." *J.J. DeLuca Co. v. Toll Naval Assocs.*, 56 A.3d 402, 417 (Pa. Super. 2012) (citation omitted). The fact-finder "must assess the testimony" and may "accept[] or reject[] the estimates of the damages given by the witnesses." *Id.* (citation omitted); *accord Beswick v. Maguire*, 748 A.2d 701, 703 (Pa. Super. 2000) (*en banc*).

Here, it was the prerogative of the trial court, as fact-finder, to reject the estimated value of the Bar given by Mr. Musso, N. T., 6/20/16, at 111 & Appellee's Ex. 41, and not to use it to calculate damages. *See J.J. DeLuca*, 56 A.3d at 417; *Beswick*, 748 A.2d at 703. The value of the Bar and, thus, the amount of damages awarded to Appellee was based upon the testimony of two of the appellants, Mr. Damerjian and Mr. Wolk, as to the amounts for which they sold the Bar. N. T., 6/21/16, at 12-13; N. T., 6/22/16, at 88. Hence, the damages were "within the reasonable limitations of the facts and circumstances of th[is] particular case." *Huey*, 39 A.2d at 604. We find no

case law – and Appellants do not cite to any – stating that a fact-finder must accept the estimates of the expert for one party or another, as Appellants suggest. *See* Appellants' Brief at 16.

As for the trial court's conclusion that Mr. Musso's valuation was "speculative," FOF & COL at 4 ¶ 15, Appellants fail to acknowledge that Mr. Musso's valuation could only be speculative due to Appellants' continuous refusal to produce court-ordered documentation. Order, 2/4/14; Mr. Henry's Mot. for Sanctions, 3/11/14; Order, 3/26/14; Order, 4/22/14; Order, 5/13/14; Mr. Henry's Mot. for Sanctions, 12/1/14; Order, 12/19/14; Mr. Henry's Mot. to Compel Appellants' Answers to Interrogs. & Resps. to Req. for Produc. of Docs. – Second Set, 2/19/15; Order, 3/3/15; Mr. Henry's Mot. for Sanctions for Failure to Comply with the Ct.'s Order of Mar. 3, 2015, & Respond to Mr. Henry's Interrogs. & Req. for Produc. of Docs. – Second Set, 3/17/15; Order, 3/31/15; N. T., 6/20/16, at 51-52, 111.

We therefore find no basis to set aside the value of the Bar as determined by the trial court as fact-finder. Thus, we hold that the damages awarded to Appellee by the trial court were proper.

Judgment affirmed.

President Judge Gantman joins this memorandum.

Judge McLaughlin concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/26/18